FLY & McFALL *v.* WATTS.

4-7167                                    190 S. W. 2d 533

Opinion delivered November 12, 1945.

Rehearing denied December 10, 1945.

*Owens, Ehrman & McHaney,* for appellant.

*Ulys S. Lovell, Buzbee, Harrison & Wright* and *U. A. Gentry,* for appellee.

McFADDIN, J. The facts in this case are quite bizarre!

In May, 1939, Scott Watts, a retail grocer of Springdale, Arkansas, purchased 100 shares of stock in Anaconda Copper Company (hereinafter called Anaconda) from the Little Rock firm of W. J. Herring & Co., Inc., (hereinafter called Herring & Co.). W. J. Herring was the manager or "head" of the company, and is referred to herein as Herring. All dealings of Watts with Herring & Co. were with W. J. Herring, except when otherwise specifically mentioned herein. Herring & Co. had its office in Little Rock, and had been in the business of stocks and bonds for several years, and had made purchases and sales through appellants, Fly & McFall (a partnership composed of D. W. Fly and O. A. McFall), which had an office in Little Rock, one in Memphis and one in New York. B. Goodbar was the manager of the Little Rock office of Fly & McFall.

Although he purchased this Anaconda stock from Herring & Co. in May, 1939, and paid $2,370 therefor, Watts never received or even saw the stock certificate. He trusted Herring & Co. to hold it for him. On September 5, 1939, Watts called Herring & Co., and instructed the sale of the 100 shares of Anaconda stock. When he did not receive his money from Herring & Co., Watts came to Little Rock on September 27th and received a check from Herring & Co. drawn on a Little Rock bank for $3,789.38 as the value of the Anaconda stock. Watts also received at the same time another check from Herring & Co. for $174.48 as Watts' profit on the sale of some Electric Bond & Share stock, which is not here in controversy. Herring requested Watts to hold the larger check until October 1st. Watts deposited these checks in a bank at Springdale; the smaller check was paid and the larger one was protested for nonpayment. On October 4th (as soon as he learned of the protest) Watts returned to Little Rock, and demanded explanation and payment from Herring & Co. Watts received a long interview, but

no money. Finally, Herring & Co. agreed to repurchase and deliver to Watts 100 shares of Anaconda stock to settle the "hot check." Herring went to the Little Rock office of Fly & McFall and placed an order for 100 shares of Anaconda stock, and received the following instrument:

"Branch Office at Little Rock

"Arkansas, October 4th, 1939.   19............

"Received from W. J. Herring and Co. Thirty-three hundred seventy-eight and 75/100 dollars ($3,378.75) represented by check No. B-4406, drawn on the Commercial National Bank of Little Rock, purchase price 100 shares Anaconda Copper common stock; certificate ordered out of New York, to be delivered to Scott Watts, Springdale, Arkansas, on instructions from W. J. Herring and Co.

"Fly & McFall by B. Goodbar."

Herring gave this instrument to Watts, along with a signed copy of the order of delivery, reading:

"October 4, 1939

"Fly & McFall
"400 Louisiana Street
"Little Rock, Arkansas

"Attn: Mr. Bernard Goodbar
"Gentlemen:

"This is your authority to deliver 100 shares of Anaconda Copper common stock which we purchased from you today @ 35-5/8, to Mr. Scott Watts of Springdale, Arkansas.

"Thanking you for your attention in regard to this matter, I am,

"Very truly yours,

"W. J. Herring & Co.

"By (s) W. J. Herring."

Herring had at that time the original of this order of delivery which Watts claims was subsequently delivered to the appellants by Herring. The delivery and accept-

ance of this order will be discussed in section I hereinafter.

The Anaconda stock was to be received by Fly & McFall in Little Rock from New York in some six or seven days from October 4th. After a lapse of only three or four days (and on either October 7th or 8th), Watts returned to Little Rock. He and his father went to the office of Fly & McFall to see if the Anaconda stock certificate had reached Little Rock, and learned that it had not. Both Watts and his father testified that they were assured by Goodbar that the certificate would be delivered to Watts as soon as received. Watts then went to see Herring & Co., explaining that he needed some money immediately, and Herring gave Watts two checks. One was a telegraphic money transmittal for $413 (as the difference between the value of the Anaconda stock on October 4th and September 27th); and the other was a cashier's check for $1,450. These made a total of $1,863 received by Watts on October 7th. Whether either of these checks was an advance against the Anaconda stock, or was part payment on the $3,789.38 bad check of September 27th, and whether the receipt of this $1,863 constituted a waiver of Watts' claim to receive the stock certificate, are matters that will be discussed in section II hereinafter.

On October 16th Watts returned to Herring & Co., again seeking the stock certificate or some additional money. On that day W. J. Herring was reported to be in the hospital, but his son took Watts to Herring's lawyer, and Watts says it was represented to him that it would be best for him to take the note of Herring & Co. for $1,872.62, due in six months, so that Herring & Co. could "realize on some other deals" and pay the note. Watts took the note; and it is now insisted by appellants that Watts thereby waived all claim against Fly & McFall for the delivery of the Anaconda stock. Watts denies this, and this will be discussed in section II hereinafter.

On October 11th, Fly & McFall, by their Little Rock manager, Goodbar, delivered the stock certificate for the 100 shares of Anaconda stock to Herring for Herring &

Co., in direct violation of the letter of instructions that Herring had written to deliver the stock certificate to Watts. Herring obtained this stock certificate by giving Fly & McFall a ''hot check'' (which was never paid), and then Herring sold the stock certificate to another stock broker for $3,289.68, using $972.22 to pay one creditor, and depositing the balance of $2,317.46 to the general bank account of Herring & Co. It was not until October 19th that Watts learned that Fly & McFall had delivered the stock certificate to Herring; and Watts immediately asserted his right to the certificate. W. J. Herring & Co., Inc., was adjudicated a bankrupt on December 27, 1939, and Floyd Barry was chosen as the trustee in bankruptcy of the estate of W. J. Herring & Co., Inc. Herring served an imprisonment sentence.

On October 1, 1940, Scott Watts filed suit in the Pulaski chancery court against Fly & McFall for $3,000 as damages alleged to have been sustained by Watts because of appellant's failure to deliver to Watts the Anaconda stock certificate in keeping with the agreement, (as evidenced by the letter of instructions of Herring to Fly & McFall and the alleged oral agreement of Goodbar to deliver the stock). The complaint recited that the full claim was reduced from $3,378.75 to $3,000. Floyd Barry, trustee in bankruptcy of the estate of W. J. Herring & Co., Inc., (hereinafter referred to as ''Barry, Trustee'') intervened and claimed a lien to the amount of $1,863 on any judgment that Watts might obtain against Fly & McFall. This intervention was on the theory that Herring & Co. was insolvent when Watts obtained the $1,863 on October 7th, and that Watts thereby obtained a voidable preference. The questions about the voidable preference will be discussed in section III herein. Watts denied the allegations of the intervention. Fly & McFall filed answers denying the complaint, and the intervention, and also cross-complaining against Scott Watts for $3,378.75. The theory of the cross-complaint was that Herring, in receiving the stock certificate, was the agent of Watts, and Watts was liable for the amount due on the stock certificate. Watts filed denial to the cross-complaint. A trial in the chancery court resulted in the decree against

Fly & McFall in favor of Watts for $3,000, and a lien imposed thereon in favor of Barry, Trustee, for $1,863. From the $3,000 judgment, Fly & McFall have appealed, and from the decree impressing a lien in favor of Barry, Trustee, the appellee, Scott Watts, has appealed. We list and dispose of the questions involved in the appeal.

I.  *Did Fly & McFall agree to deliver the Anaconda stock certificate to Scott Watts?* This is the basic question of fact on which Watts' entire case depends. The chancery court, in deciding the case against Fly & McFall, necessarily answered this question in the affirmative; and we agree that the preponderance of the evidence supports this finding. On October 4th, when Herring ordered from Fly & McFall the 100 shares of Anaconda stock, Herring received a receipt from Fly & McFall as heretofore copied. This receipt stated, *inter alia,* that the certificate was "to be delivered to Scott Watts, Springdale, Arkansas, on instructions from W. J. Herring & Co." Herring then prepared and exhibited to Watts a letter in duplicate as heretofore copied, directing Fly & McFall to deliver the stock certificate to Watts. A signed copy of this letter was given to Watts by Herring. Watts testified that he saw the original of this letter in the office of Fly & McFall on October 7th when Goodbar showed him the letter, and told him unequivocally that the stock certificate would be delivered to Watts as soon as it was received from New York. Watts' father was present at the conversation, and fully substantiated the testimony of his son. In addition, Shelby Ford, a banker of Springdale, Arkansas, testified that he talked with Goodbar over the telephone (occasioned by Watts' seeking a loan from Ford's bank, which loan was never consummated), and in that conversation Goodbar told Ford that the stock certificate would be delivered to Watts as soon as it was received from New York. Watts so insisted in his two conversations with Fly, one of the partners of Fly & McFall.

In opposition, there is the testimony of Goodbar, who said that he made no such statements about the delivery of the stock certificate, but admitted most of the other details of every conversation stated by the witnesses.

We are convinced that Fly & McFall, acting through their local manager, Goodbar, definitely, positively, and unequivocally agreed to deliver the Anaconda stock certificate to Watts, and to look to Herring's check for payment. The fact that Fly & McFall filed a claim and secured payment from a fidelity company for the amount of Herring's bad check to Fly & McFall (on the basis that the stock was obtained from them by Herring giving a bad check in fraud) further shows that Fly & McFall looked to Herring's check for payment. So we affirm the finding of the chancery court on this fact question, that Fly & McFall were definitely bound to deliver the stock certificate to Watts.

II. *Did Watts, in accepting money from Herring on October 7th, or in accepting the note of $1,872.62 on October 16th, waive or lose his claim against Fly & McFall for the stock certificate?* The chancery court, by its decree, necessarily answered this question in the negative; and we cannot say that the finding is against the preponderance of the evidence. Watts testified that the reason he sought the money from Herring & Co. on October 7th was because he needed money and the stock certificate had not come; and that he did not agree to relinquish his claim against Fly & McFall for the delivery of the stock certificate. Watts made answers to questions as follows:

"Q. What understanding, if any, was had between you and Mr. Herring with reference to the return of the $1,450, if the stock was delivered to you? A. If the stock had been delivered to me, I was to return the $1,450 to Mr. Herring. Q. On the occasion of this visit, which you place somewhere around the 7th or 8th, what conversation did you have with Mr. Goodbar with reference to the expected arrival of the stock. A. Well, Mr. Goodbar—I remember at the time we were in there, Mr. Goodbar—he even went as much as to find out that the stock had already left New York, at that time. Q. What, if anything, was said to you with reference to delivery of the stock to you upon its arrival in Little Rock? A. He said that he would. Q. Deliver it to you? A. Yes, sir."

And, again, Watts, in referring to the $1,450, said:

"A. It was understood with Herring if I got the stock I was to return the money to him."

The fact that Watts, on this same day that he obtained the $1,863, was making inquiries of, and receiving assurances from, the manager of Fly & McFall about the delivery of the stock certificate, is a strong circumstance that Watts was not intending to waive the right to receive the stock certificate when he accepted the $1,863.

On October 16th, when Watts was taken by the son of W. J. Herring to the office of the attorney for Herring & Co., where Watts accepted the note of Herring & Co. for $1,872.62 due in six months, it is clear that Watts did not, at that time, know that Fly & McFall had previously delivered the Anaconda stock certificate to Herring, in violation of Fly & McFall's agreement to deliver the stock certificate to Watts. Watts made answers to questions as follows:

"Q. On the occasion of this visit on October 16th, did Mr. W. J. Herring disclose to you that he had, five days prior, received the stock from Fly & McFall? A. No, sir. Q. Did any person reveal that to you at this time? A. No, sir.

* * * *

"Q. By the acceptance of that note, was it your intention to relinquish whatever rights you may have had against Fly & McFall? A. I never did, at any time.

"Mr. Ehrman: If the court please, we object to what his intention was. Court: I think that would be competent."

And, again, on cross-examination, Watts made answers:

"Q. Well, why did you take a note from W. J. Herring & Co. on October 16th if you still thought you were going to get this stock? Now, you already had $1,450, didn't you, and this note represented the entire balance that would have been due from Herring & Company?

A. Why did I take the note? Q. Didn't Herring tell you, on that date, that you were not going to get the stock? A. No; no, sir. Q. You were down here on the 16th, still after Herring for more money, weren't you? A. That's right. Q. And you hadn't got the stock? A. No, sir. Q. And you hadn't become suspicious that you were not going to get the stock? A. No; as far as I knew, the stock was still— Q. As far as you knew, the stock was still coming, and that was twelve days later, and you didn't go by Fly & McFall's and inquire about it? A. No, sir. Q. Nobody told you you were not going to get the stock? A. No, sir.''

We think the equities in this case were and are that Herring & Co. (as debtor) owed Watts $3,789.38, certainly, on September 27, 1937, the date of the check. The relationship was debtor and creditor; and that all of Watts' actions thereafter were those of a creditor trying to collect his debt and get security, and be made whole; and that the Fly & McFall agreement was such security; and that Herring, in placing the order for the Anaconda stock certificate with Fly & McFall, was the debtor of Watts and certainly not the agent of Watts.

III. *Did Watts, in accepting the $1,863 from Herring on October 7th, receive a preference that is voidable under the National Bankruptcy Act?* Barry, Trustee, intervened and alleged:

"At all times mentioned in the complaint herein and prior thereto, Scott Watts was an unsecured creditor of W. J. Herring & Company. On October 7, 1939, and within four months of the filing of the petition in bankruptcy, the said W. J. Herring & Company paid to Scott Watts on said indebtedness the sum of $1,863, which payment, if not voided, would enable the said Scott Watts to obtain a greater percentage of his debt than other creditors in the same class. At the time of said payment, the said Scott Watts knew, or had reasonable cause to believe, that the debtor was insolvent. Said payment constitutes a voidable preference.''

The chancery court found that Watts received a voidable preference, and rendered judgment against

Watts in favor of Barry, Trustee, for $1,863. We think the chancery court was in error in this finding, because the trustee failed to prove the essential elements of a voidable preference, as these words are understood and used in the National Bankruptcy Act, and the cases construing it.

Section 70 of the Bankruptcy Act is the section dealing with voidable preference, and may be found in 11 U.S.C.A., § 96. The germane language here to be considered is:

"(a) A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition in bankruptcy, . . . the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

.  .  .  .

"(b) Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent."

Remington on *Bankruptcy*, 5th Edition, and Collier on *Bankruptcy*, 14th Edition, are standard treatises on the National Bankruptcy Act. Volume 3, page 731, *et seq.*, of Collier deals with the essential elements of a voidable preference. The elements are numbered and arranged slightly different in Collier from those in Remington, but the net result is the same whether viewed from either treatise. In Remington, § 1657, *et seq.*, the five elements of a voidable preference are listed as follows:

1. A transfer on, or payment of, an antecedent debt.

2. By an insolvent debtor.

3. Within four months before bankruptcy.

4. Resulting in advantage to the creditor.

5. Who then had reasonable cause to believe that the debtor was insolvent.

Says Remington: "When the term 'voidable preference' is used in this chapter, it means a transaction which has all five elements or characteristics. If any element is missing, a transaction cannot result in a voidable preference."

Collier, Volume 3, page 1040, says: "Just as the trustee in his suit to recover property preferentially transferred must include allegations, in his statement of claim, of all the elements of the alleged voidable preference, so also must the trustee introduce evidence at the trial to sustain all such averments that have not been admitted. The law places upon the trustee (or receiver) the unmistakable burden of proving by a fair preponderance of all the evidence every essential, controverted element resulting in the composite voidable preference."

Herring & Co. was adjudicated a bankrupt on December 27, 1939, and it was stipulated that on October 7, 1939, the corporation was insolvent, and we have previously stated that Scott Watts was a creditor of Herring & Co. at all times from September 27th: so the first three elements of a voidable preference are shown or admitted in the case at bar; but neither the fourth nor the fifth element of a voidable preference has been established.

Regarding the fourth element—resulting in advantage to the creditor—the trustee had the burden of proving that when Watts received the $1,863 on the $3,378.75, he thereby received a preference—i.e., a greater percentage of his debt than other creditors of the same class. (See Remington, 5th Edition, § 1700, et seq.). But there is absolutely no evidence in the record here to show what other creditors of Herring & Co., of the same class as Watts, received or would receive from the bankrupt estate. There is no showing that Watts filed a claim in the bankrupt estate of Herring & Co. In short, there is no evidence in the record in this case to prove the existence of the fourth element of a voidable preference.

Regarding the fifth element—reasonable cause to believe the debtor insolvent—the evidence convinces us that Watts did not have any such reasonable cause on October 7th when he received the $1,863. Watts knew that Herring & Co. had issued him a check for $3,789.38, and that it had been protested, but that fact—standing alone and by itself as it does here—is not sufficient to conclusively show reasonable cause. As stated by Remington, § 1710:

"Mere suspicion is not enough, even if it has led the creditor to refuse further credit. . . . Mere doubt of solvency is not enough. A creditor may feel anxious about his claim, and have a strong desire to secure it or have it paid, and yet not have such belief as the act requires. . . ."

Collier, Vol. 3, p. 988, after pointing out that under the Bankruptcy Act, insolvency means the excess of liabilities over assets, says:

". . . mere inability to meet current obligations is not insolvency in the bankruptcy sense, which is the excess of liabilities over assets at a fair valuation."

Goodbar, the agent of Fly & McFall, testified about the condition of Herring & Co. at the time that Watts received the $1,863. Goodbar made answers to questions as follows:

"Q. You knew that Herring—I mean W. J. Herring & Co., Inc.—you knew it was in financial straits at that time, didn't you? A. No, sir; I believed just the contrary. Q. Hadn't Herring had some irregular dealings with Fly & McFall prior to this time? A. No, sir; all of Herring's dealings had always been strictly on the up-and-up. That's one thing that made me have so much confidence in him. .He did give us two bad checks, about which I wrote the firm and suggested to the firm that they discontinue shipping stocks to him in this manner. They vetoed that and suggested I tell Herring if there was a repetition, they would stop shipping him stock.

. . . .

"Q. Didn't the fact that two checks of a dealer of the size of Herring & Co. were turned down by his bank serve as notice to you of his business instability? A. No, not exactly that. Ordinarily, it would make me suspicious but, in this case, it didn't. I was in Herring's office frequently, and he had a big business. I have seen him sit there and buy $100,000 worth of bonds at a clip. He had all the appearance of progressiveness, aggressiveness, and prosperity, and I had no reason to believe otherwise. He had never done anything shady, so far as I was aware of. I wasn't a bit alarmed when they told me the check had been turned down. I thought he would make it good. I thought he was very resourceful and smart."

If Goodbar, the manager of Fly & McFall, engaged in the stock broker business for many years, did not have reasonable cause to believe that Herring & Co. was insolvent, then certainly Watts, a country grocer from Springdale, Arkansas, should be charged with no greater perspicacity. Further, if Watts had believed Herring & Co. to be insolvent, it is inconceivable that on October 16th he would have taken a plain note due in six months rather than to have continued immediately to press for his money.

To cite all or even a substantial number of cases of "reasonable cause" would be a work of supererogation. We mention only *Harrison* v. *Merchants' National Bank*, 124 Fed. 2d 871, as a comparatively recent case from the Eighth Circuit Court of Appeals, and indicating the general holdings. Judge Nordbye, who delivered that opinion, said:

"As one views any business failure in the retrospect, many incidents and circumstances bearing upon a bankrupt's financial condition loom much larger and more formidable than they did before the crash occurred. All well-considered cases have enunciated the doctrine that mere apprehension on the part of the creditor is not equivalent to good cause to believe that insolvency exists. *Grant* v. *First National Bank*, 97 U. S. 80, 24 L. Ed. 971.

"The language used by the Supreme Court in *Stucky* v. *Masonic Savings Bank,* 1883, 108 U. S. 74, 2 S. Ct. 219, 27 L. Ed. 640, is particularly apposite. The court was considering the dealings of a creditor with a debtor in failing circumstances, and stated (page 75 of 108 U. S., page 220 of 2 S. Ct., 27 L. Ed. 640) : '. . . He may feel anxious about his claim and have a strong desire to secure it, yet such belief as the act requires may be wanting. Obtaining additional security or receiving payment of a debt under such circumstances is not prohibited by law.' "

From all the evidence, we conclude that the trustee in bankruptcy has failed to prove all the essentials of a voidable preference, and therefore the judgment in favor of Barry, Trustee, should be reversed and dismissed.

IV. *What amount should Watts recover on this appeal?* Having reached the conclusion—as we have—that Watts should recover from Fly & McFall the damages that he suffered because of the misdelivery of the stock certificate, and that Barry, Trustee, should not recover from Watts on account of a voidable preference, we come, in conclusion, to what amount Watts should recover for his damages ; and this involves a brief recapitulation of the facts and figures.

1. Herring & Co. owed Watts on September 27th the sale price of the Anaconda stock; this was evidenced by the check and was $3,789.38.

2. On October 4th Herring agreed to purchase 100 shares of Anaconda stock and deliver it to Watts. He made the purchase ; and on that date the Anaconda stock had a value of $3,378.75.

3. Deducting the October 4th value from the September 27th value as shown (1) and (2) above, it will be observed that Watts stood to lose $410.63 by this decline. To cover this "differential," Herring gave Watts on October 7th a telegraphic money transmittal for $413, which was separate and distinct from the $1,450 cashier's check of that date. When Herring gave Watts the $413 on October 7th, that left Watts entitled only to the Ana-

conda stock certificate which Herring had ordered on October 4th, and which Fly & McFall misdelivered on October 11th at a value of $3,378.75.

4. But Herring on October 7th paid Watts $1,450, which Watts said was to be returned to Herring when Watts received the stock certificate. Since Watts never received the stock certificate, he keeps the $1,450, but must deduct this from the value of the stock certificate and the damages that he suffered by reason of the misdelivery of the certificate by Fly & McFall on October 11th.

5. Deducting the $1,450 from the $3,378.75 leaves the balance of Watts' damages at $1,928.75. That is the only remaining damage that he has suffered by reason of the misdelivery of the stock certificate by Fly & McFall, and is the greatest amount that he should recover in this suit.

6. When Watts filed this present suit, he stated that his damage for the misdelivery of the certificate was $3,378.75, but he voluntarily reduced his claim to $3,000. Thus, he agreed to reduce his damages by $378.75; and this amount should be deducted from the $1,928.75, which leaves the damage at $1,550.

7. So, the net result is that Watts is entitled to judgment for $1,550 with interest at 6 per cent. from October 11, 1939, the date of the misdelivery of the stock certificate.

Watts cannot complain at this small amount, because it makes him whole (except for the $378.75 that he voluntarily waived when he filed this suit). Barry, Trustee, cannot complain; because when he intervened in this case he did not ask that Watts be declared a trustee for the $1,450, but intervened solely on the theory that Watts had received a voidable preference. Furthermore, the proof shows that when Fly & McFall misdelivered the stock certificate to Herring & Co. on October 11th, Herring immediately sold the stock certificate for $3,289.68 and paid $972.22 to another creditor and deposited the balance of $2,317.46 to the bank account of Herring &

Co. So Herring & Co. received the benefit of the stock certificate that Fly & McFall misdelivered.

The decree of the chancery court is reversed and remanded, with directions to enter a judgment against Fly & McFall for $1,550 and interest at 6 per cent. from October 11, 1939, until paid, together with all costs, and to enter a decree denying all relief to Barry, Trustee.

McHANEY and HOLT, JJ., dissent.