**DINKELSPIEL v. WEAVER.**
Civ. A. No. 542.

United States District Court
W. D. Arkansas, Hot Springs Division.
Nov. 23, 1953.

McMath, Leatherman & Woods, Little Rock, Ark., for plaintiff.

D. D. Panich, Little Rock, Ark., for defendant.

JOHN E. MILLER, District Judge.

On March 7, 1953, plaintiff, as trustee in bankruptcy for Harry Archer Davis, bankrupt, filed his complaint against the defendant, Charles Weaver, seeking to set aside certain transfers of money from the bankrupt to defendant on the ground that said transfers were preferences under the provisions of Section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96.

On April 11, 1953, defendant filed his answer in which he admitted receiving the money but denied that said transfers were preferences. The defendant also pleaded a setoff under the provisions of Section 60, sub. c of the Bankruptcy Act.

The case was tried to the Court on October 7 and 8, 1953, and at the conclusion of the trial the Court took the case under advisement pending the submission of briefs by the parties in support of their respective contentions. The briefs have been received, and now the

Court, having considered the pleadings, ore tenus testimony of the witnesses, exhibits, stipulations, and briefs, makes and files herein its findings of fact and conclusions of law, separately stated.

### Findings of Fact

#### I.

On April 11, 1951, Harry Archer Davis filed his voluntary petition in bankruptcy in this Court, and on the next day, April 12, was adjudicated a bankrupt. The plaintiff, Leon Dinkelspiel, is the duly appointed and qualified trustee in bankruptcy for the said Harry Archer Davis, bankrupt, and brings this suit in his capacity as trustee.

#### II.

Prior to September 20, 1950, Mattar's Art Galleries, Hot Springs, Arkansas, was owned and operated by Eli G. Mattar and the said Harry A. Davis as a partnership, but on that date the partnership was dissolved by mutual consent of the partners, and under the terms of the dissolution Harry A. Davis became the sole owner of the said Mattar's Art Galleries and continued to do business under that name. At that time the business was solvent.

Prior to the dissolution of the partnership, the defendant made the following loans to Mattar's Art Gallaries: March 20, 1950, $12,000; April 21, 1950, $8,000; May 20, 1950, $9,734.75; May 23, 1950, $1,342.50; and June 12, 1950, $10,000, making a total of $41,077.25. All of these loans were unsecured except the loan dated June 12, 1950, which loan was secured by certain jewelry and diamonds on that date delivered to defendant by Mattar's Art Galaries.

Seven of the diamond rings which were pledged to defendant on June 12, 1950, were consigned by defendant to Mattar's Art Galleries on June 30, 1950. Three of these rings were redeemed by the said Mattar's Art Galleries but the other four rings having a total value of $4,700 were neither paid for nor returned to the defendant.

On January 5, 1951, subsequent to the dissolution of the partnership, Harry A. Davis paid to the defendant $292.50 on the indebtedness and secured the release from him of one of the pledged rings. On the same date Davis, by check, paid defendant $734.75 as "part payment of loan." Also on the same date, Harry A. Davis executed a series of checks numbered from 414 to 439 inclusive, each in the sum of $500 payable to defendant, and each of the checks was marked "part payment of loan."

The $10,000 which defendant loaned to Mattar's Art Galleries on June 12, 1950, had been borrowed by defendant from the Arkansas Trust Company of Hot Springs, Arkansas, and, after receiving the above-mentioned checks, defendant took them to George Sexton, Vice-President of said bank, and asked him to collect them as he could and apply them on defendant's note with the bank. Being a friend of the defendant, Sexton complied with his request and, when funds were available, he would clear one of the checks by crediting the amount on defendant's note and charging said amount against the Davis account. In this manner the following checks were paid:

Check No. 414, paid on January 27, 1951
Check No. 415, paid on January 29, 1951
Check No. 416, paid on February 2, 1951
Check No. 417, paid on February 12, 1951
Check No. 418, paid on February 17, 1951
Check No. 419, paid on February 27, 1951
Check No. 420, paid on March 8, 1951
Check No. 421, paid on March 27, 1951
Check No. 422, paid on March 28, 1951

Checks numbered 423 through 439, both inclusive, of the said series of checks were not paid and are now attached to a proof of claim filed by defendant as a part of his common claim against the estate of the bankrupt.

During the period of time when checks numbered 414 to 422 were paid, the bank account of Harry A. Davis was very active, but usually at the end of the day there was a very small balance. Checks were turned down practically every day,

and, in the words of Sexton, it was "more or less a case of first come, first served."

Sexton knew the state of said bank account of Davis, and handled the checks in the manner above stated as an accommodation to a customer and to aid the customer to pay the bank his debt. Defendant left the entire matter in the hands of the bank and apparently had very little knowledge of the status of the account.

The jewelry and diamonds which were pledged to the defendant on June 12, 1950, with the exception of the seven items defendant consigned to Mattar's Art Galleries, were held by him until January 5, 1951, and on various dates subsequent to January 5 and within about two and one-half months thereafter the defendant, upon the request of Davis, delivered to Davis the remaining jewelry and diamonds defendant had been holding as security. The value of the jewelry returned to Davis by defendant subsequent to January 5, 1951, was $3,938.70, and defendant received no new security.

Approximately sixty days after January 5, 1951, defendant loaned Davis the sum of $1,000, which loan was unsecured and was never repaid.

### III.

The amount of unsecured claims filed against the bankrupt's estate is approximately $100,000 and the maximum amount which will be available for distribution to unsecured creditors is approximately $25,000 to $30,000. Therefore, the maximum percentage unsecured creditors may be able to recover is 25 to 30 per cent. Defendant has filed a proof of claim as an unsecured creditor in the amount of $11,773.90, and if the transfers involved herein are permitted to stand, defendant will receive a greater portion of his debt than other creditors of the same class.

### IV.

Harry A. Davis did not keep a proper or recognized set of books in the operation of his business. He had a daily sales record in which he entered sales by general classifications; a diamond register; watch register; check book with the stubs of checks he had written; invoice files and similar files of data. He did not have a general register or general ledger, nor did he have a book in which he recorded checks as written. He had no cash receipts and disbursement register and no journal. He had no complete record of notes payable, although he did have a small diary in which he entered the due date of merchandise notes payable.

In June, 1951, plaintiff employed Oscar W. Luebben, a certified public accountant, to review the records of the bankrupt in an effort to ascertain whether a tax deficiency that had been assessed by the Government against Harry Davis and Eli Mattar was a proper deficiency. Luebben did not audit the books but started with the date of September 20, 1950, the date of the dissolution of the partnership, and prepared a "reconstructed" balance sheet for the dates, September 20, 1950, and December 31, 1950. He also prepared a profit and loss statement for the period from September 20, 1950, to December 31, 1950, and for the period from January 1, 1951, to April 9, 1951. Luebben frankly admitted that these documents were not prepared in accord with general accounting principles because it was impossible, due to the state of the bankrupt's books, to verify the assets and liabilities.

The difficult nature of Luebben's work in preparing the documents is demonstrated by the fact that he did not complete them until July or August, 1952, more than a year after he was first employed by plaintiff.

If the balance sheet and profit and loss statement prepared by Luebben are correct, there is little doubt but that Davis was insolvent during the period from January 5, 1951, to March 28, 1951, the time within which the checks were paid. However, the meager and incomplete records of the bankrupt did not contain sufficient information from which to construct an accurate balance sheet and

profit and loss statement. This is especially true in view of the questionable nature of the inventory. The inventory of September 20, 1950, merely reflected totals for merchandise, fixtures, notes payable, liabilities, etc., without any effort to state an accurate item by item inventory. And, as to subsequent inventories it is very questionable whether all the bankrupt's property was included in said inventories.

In other words, the Court feels that the balance sheet and profit and loss statement were based upon too many assumptions and uncertainties to be considered a valid estimate of the bankrupt's financial condition. In fact, it is very doubtful if anyone, including Davis, could have ascertained his true financial condition at the time in question.

Plaintiff introduced no other proof of the bankrupt's financial condition except the testimony of Mr. Sexton concerning the non-payment of certain checks and notes.

### V.

The defendant knew very little about the bankrupt's business. In fact, the loans made by defendant to Mattar's Art Galleries were made prior to the time the partnership between Mattar and Davis was dissolved, and it was not until after the bankruptcy of Davis that defendant learned the said partnership had been dissolved. That is, at the time of the transactions involved herein defendant still thought Davis and Mattar were partners.

Both defendant and Sexton knew that some of Davis' checks were being dishonored, but this condition had existed for some time and Davis was still doing a large volume of business. In other words, defendant and Sexton knew that Davis was having some difficulty maintaining sufficient cash to meet his current obligations, but the testimony does not disclose any facts that were then known tending to show that his total assets might not be sufficient to pay his total debts.

And, even if they had become suspicious of Davis' financial condition, an inquiry or an examination of Davis' books would not have revealed his true financial condition.

### Discussion

The plaintiff admits, as indeed he must, that in order to establish a preference under the provisions of Section 60, sub. a of the Bankruptcy Act he must prove the following elements: (1) Transfer by the debtor of his property. (2) Creditor relationship of transferee. (3) That the transfer was for an antecedent debt and resulted in diminution of the debtor's estate. (4) Insolvency of debtor at the time of said transfer. (5) That the transfer was within four months before the filing of the petition in bankruptcy. (6) That the transfer enabled the transferee to obtain a greater portion of his debt than others of the same class. (7) That the transferee or his agent knew or had reasonable cause to believe that the debtor was insolvent at the time of the transfer. See Dinkelspiel v. Garrett, D.C.Ark., 96 F.Supp. 800, 803.

At the outset it may be stated that requirements (1), (2), (5) and (6) are clearly established by the evidence and no discussion is necessary concerning them. The remaining elements will be discussed in numerical order.

### Diminution of Debtor's Estate

In order to establish a preferential transfer the trustee must prove that the transfer resulted in a depletion of the bankrupt's estate. In Continental & Commercial Trust & Savings Bank v. Chicago Title & Trust Co., 229 U.S. 435, at page 443, 33 S.Ct. 829, at page 831, 57 L.Ed. 1268, the Court said:

> "To constitute a preferential transfer within the meaning of the bankruptcy act there must be a parting with the bankrupt's property for the benefit of the creditor, and a consequent diminution of the bankrupt's estate."

In Miller v. Fisk Tire Co., D.C.Minn., 11 F.2d 301, 304, the Court said:

"There can be no preferential transfer without a depletion of the bankrupt's estate. * * *

"The burden of showing that the bankrupt's estate was diminished by the payment to the defendant was upon the trustee."

In Walker v. Wilkinson, 5 Cir., 296 F. 850, 852–853, certiorari denied 265 U.S. 596, 44 S.Ct. 639, 68 L.Ed. 1198, the Court said:

"The purpose of the law of preferences is to secure an equal distribution of the bankrupt's assets among his creditors of like class. If a transaction, in its entirety, does not interfere with this purpose of the law, it does not constitute a voidable preference. The fact that one creditor is paid in full from a source, to which other creditors have no right to resort, does not entitle other creditors to complain or the trustee to recover the amount so received. The transfer or payment must be one that diminishes the fund to which creditors of the same class can legally resort for the payment of their debts, and to an extent that makes it impossible for such other creditors to obtain as great a percentage as the favored one, in order that the transaction constitute a preference. * *

"The right of offset as against the recovery of a preference given by section 60c is not exclusive. In any case in which the result of allowing the offset does not disturb, but promotes, equality of distribution among creditors of the same class, it is proper; and the effect of allowing it, in this respect, is to be determined by the entire transaction between the creditor and the bankrupt."

In Root Mfg. Co. v. Johnson, 7 Cir., 219 F. 397, 401, affirmed in 241 U.S. 160, 36 S.Ct. 520, 60 L.Ed. 934, the Court said:

"On the other hand, it is unquestionable that the statute does not denounce as preferential all payments so obtained by a creditor within the four-months period; that payment may lawfully be accepted for discharge of a valid lien, either legal or equitable; * * * and that a transaction is not an unlawful preference unless 'the estate of the bankrupt was thereby diminished.' "

To the same effect, see Citizens' Nat. Bank of Gastonia, N. C. v. Lineberger, 4 Cir., 45 F.2d 522, 526; Israel v. Woodruff, 2 Cir., 299 F. 454 (pledged potatoes); In re K. G. Whitfield & Bro., D. C.Tenn., 290 F. 596, 599; Lucey v. Matteson, D.C.N.Y., 215 F. 244, 247; Cheek v. Beverly-Wilshire Properties, Inc., D. C.Cal., 103 F.Supp. 913, 914.

In the instant case, subsequent to January 5, 1951, defendant returned to Davis pledged jewelry of the value of $3,938.70. This jewelry was pledged to the defendant on June 12, 1950, long prior to the filing of the petition in bankruptcy, and defendant had a valid lien upon said jewelry. Plaintiff contends that in returning the pledged jewelry to Davis the defendant was merely returning Davis' own property, and that this did not add to Davis' estate because his statement of assets and liabilities would remain the same. However, the question is not whether the book value of Davis' estate was increased, but whether the value of his estate subject to distribution among his creditors was increased. In other words, defendant had a valid lien upon the pledged jewelry, and, had he retained possession, the said jewelry or the proceeds thereof would not have been available for distribution to other creditors unless the proceeds amounted to more than the debt secured by said jewelry. See, Manhattan Co. v. New York, N. H. & H. R. Co., 2 Cir., 171 F.2d 482, 483; Gins v. Mauser Plumbing Supply Co., Inc., 2 Cir., 148 F.2d 974, 979; Harrison v. Merchants Nat. Bank of Fort Smith, Ark., 8 Cir., 124 F.2d 871, 875; In re McCown, D.C.Pa., 31 F.2d 334, 335, affirmed in Middleton v. Fidelity-Philadelphia Trust Co., 3 Cir., 35 F.2d 851;

8 C.J.S., Bankruptcy, § 266(5), page 963. Thus, when defendant returned said pledged jewelry to Davis, thereby relinquishing his lien, that part of Davis' estate available for distribution to creditors was increased.

■ During the period of time when defendant was returning said pledged property of the value of $3,938.70, Davis paid to defendant the sum of $5,234.75, and the net effect of these transactions was to deplete Davis' estate (available for distribution to creditors) in the amount of $1,296.05. Therefore, even if all the other elements of a preference were present the total amount of the preference would only be $1,296.05.

Insolvency of Debtor at Time of Transfer

Section 1(19) of the Bankruptcy Act, 11 U.S.C.A. § 1(19), provides:

"A person shall be deemed insolvent within the provisions of this title whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts".

■■ The value of the assets must be determined as of the time of the transaction and not according to the price they might bring subsequent to bankruptcy. Mutual Savings & Loan Association v. McCants, 4 Cir., 183 F.2d 423, 425. And, inability to meet current obligations does not, in itself, amount to insolvency. Cusick v. Second Nat. Bank, 73 App.D.C. 16, 115 F.2d 150, 155; Fly & McFall v. Watts, 209 Ark. 282, 293, 190 S.W.2d 533.

■ The adjudication in bankruptcy creates no presumption of the bankrupt's insolvency at a prior date. In Arkansas Oil & Mining Co. v. Murray Tool & Supply Co., 8 Cir., 127 F.2d 564, 566, the Court said:

"No inference arises from an adjudication in bankruptcy that the bankrupt was insolvent within the meaning of the act four months before he was adjudged such, or at any other prior date. Many contingencies might happen to reduce a person from a status of solvency to that of insolvency within a short space of time.

"Insolvency, under the act here involved, must be determined according to whether or not the aggregate of a person's property at a fair valuation is sufficient to pay his debts."

See also, In re K. G. Whitfield & Bro., supra, at page 600 of 290 F.

■ There is some question as to whether the transfer of a check is complete at the time the check is given to the payee or at the time the check is paid by the drawee. See, Vol. 3, Collier on Bankruptcy, 14th Ed., Section 60.14, Page 805; 7 A.L.R.2d 1016–1019. The Court is of the opinion that where, as in this case, the drawer did not have sufficient money in the bank to cover the checks, the transfer of said checks would not be completed until paid by the drawee. However, the result is the same in the instant case regardless of which time the transfers were completed, because the Court has concluded that plaintiff failed to prove that Davis was insolvent at any time prior to his adjudication in bankruptcy on April 12, 1951.

■ Courts realize the difficulty often confronting a trustee in attempting to prove the insolvency of a bankrupt at the time of an alleged preference, and, if it can be shown that no substantial change in the bankrupt's financial condition occurred between the time of the alleged preference and the time of the adjudication in bankruptcy, it may reasonably be assumed that he was insolvent at the time of said alleged preference. Brown Shoe Co. v. Carns, 8 Cir., 65 F.2d 294, 296. But, in the instant case the bankrupt was engaged in a business which fluctuated rapidly, and, as pointed out in Arkansas Oil & Mining Co. v. Murray Tool & Supply Co., supra, many contingencies might have arisen to

reduce him from a state of solvency to one of insolvency in a very short time.

It is true that the reconstructed balance sheet and profit and loss statement prepared by Luebben, if correct, would be sufficient to show Davis' insolvency during the period of time when the transfers involved herein were made, but the Court is convinced that these documents are based upon too many assumptions and uncertainties to be entitled to serious consideration. The books and records of the bankrupt were so incomplete that it was impossible for Luebben to make proper verification. He admitted that the only reliable figure he had to work with was the amount of the claims filed against the bankrupt's estate. Aside from that figure, and the records of Davis' bank account which were obtained from the bank, Luebben was forced to work with the incomplete and entirely untrustworthy books of the bankrupt. He necessarily had to rely, to a large extent, upon Davis' meager inventory records in ascertaining said inventory upon the dates of September 20, 1950, and December 31, 1950, and there is no way of knowing whether said amounts represented the actual cash value of said merchandise at that time. And, since Davis' inventory constituted practically all of his assets, any error made in stating the inventory would have a substantial effect upon both the balance sheet and profit and loss statement.

Likewise, the evidence was unsatisfactory on the question of whether several loan or pledge transactions were properly represented on the balance sheet and profit and loss statement. (See transcript, 82–92.)

In other words, there are so many uncertainties concerning Davis' financial condition during the time the transfers were being made that the Court is unable to determine his financial condition, and plaintiff has failed to prove that Davis was insolvent ðn any or all of the dates when the said transfers wëre made. Therefore, plaintiff has failed to prove that the said transfers were preferences within the meaning of the Bankruptcy Act.

### Reasonable Cause to Believe Debtor Insolvent

The rule regarding "reasonable cause" to believe the debtor insolvent is stated in the case of In re Eggert, 7 Cir., 102 F. 735, 741, as follows:

"The resultant of all these decisions we take to be this: That the creditor is not to be charged with knowledge of his debtor's financial condition from mere nonpayment of his debt, or from circumstances which give rise to mere suspicion in his mind of possible insolvency; that it is not essential that the creditor should have actual knowledge of, or belief in, his debtor's insolvency, but that he should have reasonable cause to believe his debtor to be insolvent; that if facts and circumstances with respect to the debtor's financial condition are brought home to him, such as would put an ordinarily prudent man upon inquiry, the creditor is chargeable with knowledge of the facts which such inquiry should reasonably be expected to disclose."

In other words, it is not essential that the creditor have actual knowledge of the debtor's insolvency, because, if he has knowledge of facts sufficient to put a prudent man upon inquiry, he is charged with knowledge of the facts such an inquiry would disclose. Rollins v. Repper, D.C.Mich., 69 F.Supp. 976, 979.

Knowledge by the creditor of dishonored checks issued by the bankrupt is evidence which may be considered in determining whether the creditor had sufficient notice to put him upon inquiry. Robie v. Myers Equipment Co., D.C.Minn., 114 F.Supp. 177, 181. However, such knowledge on the part of the creditor is not, of itself, conclusive of the question of reasonable cause. Bostian v. Levich, 8 Cir., 134 F.2d 284, 286. And this is particularly true in cases

where the bankrupt maintains poor records and ordinarily does business in a slovenly manner. In Brookheim v. Greenbaum, D.C.N.Y., 225 F. 635, 637, affirmed 2 Cir., 225 F. 763, the Court said:

"Now, that being admitted, the longer the situation remained and the bankrupt continued to do business, the more reason had the persons who dealt with him to suppose that, although he was dealing on a very narrow margin and practically had no free capital, he nevertheless was not insolvent. It must be remembered that a man who is always short in cash is only a man who has no free capital. It does not follow necessarily, as both sides concede, that he is insolvent because he is not quick pay. However, the fact that a man in business is not able to pay up when he is pressed in many cases may well be a ground for inquiry, and even for sufficient suspicion of insolvency to justify a suit like this, as, for example, in the case of a large business conducted with prudence and accuracy; but it does not seem to me that, in the case of a man who concededly did business in such an unbusinesslike way as this bankrupt, shortness of cash and absence of free capital, continuing for so long a period of time without any insolvency, ought to be enough to put on inquiry all those who dealt with him. It must be remembered that something more than suspicion is necessary."

Furthermore, the facts must be considered in the light of the circumstances existing at the time of the alleged preference. In Harrison v. Merchants Nat. Bank of Fort Smith, Ark., supra, the Court at page 873 of 124 F.2d said:

"As one views any business failure in the retrospect, many incidents and circumstances bearing upon a bankrupt's financial condition loom much larger and more formidable than they did before the crash occurred. All well-considered cases have enunciated the doctrine that mere apprehension on the part of the creditor is not equivalent to good cause to believe that insolvency exists. Grant v. First National Bank, 97 U.S. 80, 24 L.Ed. 971.

" 'Reasonable cause to believe that a preference was intended cannot be held to be proved by circumstances that would merely excite suspicion. And circumstances may seem suspicious after the bankruptcy occurs that would not appear unusual at the time of their occurrence, and would then have presented no "reasonable cause" on which to found a belief of intended preference. Merchants and other business men constantly continue to make payments up to the very eve of failure, and it would be disastrous to have them set aside on slight proof or mere suspicion.' Sabin v. Western Dry Goods Co., 9 Cir., 2 F.2d 130, 131."

In view of the foregoing authorities, the Court is of the opinion that even if Davis were insolvent at the time of the transfers, neither the defendant nor Sexton knew or had reasonable cause to believe that Davis was insolvent.

It is true that both defendant and Sexton knew that a substantial number of Davis' checks were being dishonored, but it is also true that this condition had existed for a number of months and apparently Davis was continuing to do business in his ordinary unbusinesslike manner. His bank account during this time was very active and he was seemingly doing a large volume of business. Under these circumstances, the defendant might reasonably have assumed that Davis was merely short on ready cash, but that his inventory and other assets were entirely sufficient to pay his debts.

And, even if defendant had knowledge of sufficient facts to put him upon inquiry, such an inquiry would have gained him nothing. The state of Davis' books was such that neither the defendant nor anyone else could have ascertained his financial condition unless a complete au-

dit was made, and even then the accuracy of the audit would be doubtful. See, In re Solof, 9 Cir., 2 F.2d 130, 131.

 It follows from the foregoing discussion that the transfers complained of by the plaintiff herein were not preferences within the meaning of the Bankruptcy Act, and that the complaint of plaintiff should be dismissed.

### Conclusions of Law

#### I.

The Court has jurisdiction of the parties to and the subject matter of this cause of action.

#### II.

The transfer of checks numbered 414 to 422, inclusive, and check number 440, in the total amount of $5,234.75, by Harry Archer Davis to the defendant, Charles Weaver, did not amount to a preference within the meaning of Section 60 of the Bankruptcy Act, and therefore the complaint of the plaintiff should be dismissed.

A judgment in accordance with the above should be entered.