### PRICE v. WILCOX OIL CO.
### Civ. A. No. 1105.

United States District Court
W. D. Arkansas, Fort Smith Division.
Feb. 5, 1954.

Hardin, Barton, Hardin & Garner, Ft. Smith, Ark., Charles L. Gocio, Jr., Bentonville, Ark., for plaintiff.

Glenn R. Davis, Tulsa, Okl., Dickson & Putman, Fayetteville, Ark., for defendant.

JOHN E. MILLER, District Judge.

On August 15, 1953, the plaintiff, as trustee in bankruptcy for G. G. Roberts, bankrupt, filed his complaint against the defendant Wilcox Oil Company, seeking to set aside certain transfers of money from Roberts to the defendant on the ground that they were voidable preferences under Section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96.

By its answer, filed September 29, 1953, defendant denied that the payments to it by the bankrupt, Roberts, constituted voidable preferences.

The case was tried to the Court on January 27, 1954, and at the conclusion of the trial the Court orally announced its findings of fact and conclusions of law. And now the Court, having considered the pleadings, ore tenus testimony of the witnesses, exhibits, stipulations, and admissions of facts filed in response to requests therefor, makes and files herein its formal findings of fact and conclusions of law, separately stated.

### Findings of Fact

#### 1.

G. G. Roberts filed his voluntary petition in bankruptcy on November 25, 1952, and on December 9, 1952, was adjudicated a bankrupt. M. L. Price, plaintiff herein, is the duly appointed and qualified trustee in bankruptcy for the said G. G. Roberts, bankrupt, and brings this suit in his capacity as trustee.

#### 2.

For some time prior to his adjudication as a bankrupt, G. G. Roberts had been doing business as The Quality Oil Company, in Rogers, Arkansas, a wholesale business which provided gasoline, oil, tires and other automotive supplies to retail dealers. A considerable portion of Roberts' business consisted of bulk sales of gasoline, which, in a large measure, he purchased from the defendant, Wilcox Oil Company. For approximately a year prior to the filing of his petition in bankruptcy, Roberts had been paying for gasoline purchased from Wilcox upon receipt of invoice, i. e., when Roberts' trucks were loaded at the refinery a copy of the invoice was given to his driver and another was transmitted to him by mail. Upon receiving the invoice, Roberts immediately remitted by check. During this period of time, business relations between Roberts and Wilcox had been quite satisfactory. The former's remittances were prompt and the volume of his business had steadily increased to the point that Roberts was purchasing one or two truck loads of gasoline a day from Wilcox.

On September 4, 1952, however, a routine check of Roberts' account by Wilcox employees revealed that Roberts had not paid for any gasoline purchased since August 20, 1952, and was indebted to Wilcox in the sum of $10,117.55. This fact was brought to the attention of the sales manager. That afternoon the sales manager and credit manager of Wilcox drove to Rogers, Arkansas, to discuss Roberts' account with him. On their arrival, however, they found that Roberts was not at his place of business and being unable to locate him, they went on to Joplin, Missouri, in connection with other business. They returned to Rogers on the 5th, the following day, but were again unsuccessful in their efforts to find Roberts, and returned to Tulsa that evening.

L. G. Murrell, Sales Manager, and Glenn R. Davis, Acting General Counsel of Wilcox, returned to Rogers on the 8th of September, 1952. After further unsuccessful attempts to contact Roberts, they talked to officers of the bank where he did business and were informed that Roberts was considered a reliable business man and a good credit risk. Subsequently, Murrell and Davis discovered that Eli Leflar, a Rogers attorney, represented Roberts, and upon contacting Leflar, were advised that Roberts was involved in marital difficulties, that threats had been made on his life, and for this reason he had been concealing himself for several days. A meeting was arranged, however, for the morn-

ing of the 10th of September, and at that meeting Roberts advised the Wilcox representatives that because of his absence many of his accounts receivable had not been collected and that he would make payment in a few days. At that time, Roberts executed and delivered to the Wilcox representatives a promissory note in the principal sum of $10,117.55. Before returning to Tulsa, the Wilcox men checked the county records to determine the amount of secured indebtedness owed by Roberts, judgments, pending cases, etc., against him. They discovered no judgments or suits, and only certain chattel mortgages, principally on rolling stock, of which Roberts had already apprised them. They made further inquiry in regard to his credit standing and reliability, and were told in each instance that he was considered a sound business man and a good credit risk. The Executive Vice President of the McIlroy Bank at Fayetteville, Arkansas, which was financing some of Roberts' operations, stated to them that the bank's transactions with Roberts had been satisfactory in every respect, and that a recent investigation of Roberts had been very gratifying. Defendant's representatives did not, however, except of Roberts himself, inquire as to the amount of Roberts' assets and liabilities. Their inquiries were limited to general questions in regard to his credit standing and reliability.

At the trial defendant introduced reports on Roberts received from Dun and Bradstreet, which, with the exception of one received on November 14, 1952, more than two months after the execution of the note and a month after it was paid in full, gave no indication that his financial condition was anything other than that reflected in the first report—good.

### 3.

Murrell and Davis returned to Tulsa, Oklahoma, and in less than a month Roberts paid the note in full. The payments were made as follows: September 13, 1952, $7,117.55; September 23, 1952, $1,000; September 29, 1952, $1,000; October 9, 1952, $1,000. Thus, all the payments were made within four months before the filing of the petition in bankruptcy.

### 4.

The maximum percentage unsecured creditors may be able to recover from the bankrupt's estate is thirty to thirty-five per cent, and, should the transfers herein involved be allowed to stand, defendant will receive a greater portion of its debt than other creditors of the same class.

### Discussion

Only recently this Court has had an occasion to discuss fully the elements a trustee in bankruptcy must prove in order to establish a preference under the provisions of Section 60, sub. a of the Bankruptcy Act. Dinkelspiel v. Weaver, D.C.Ark., 116 F.Supp. 455, 459. In that case the Court expressed its views concerning the law governing preferences, and the rules of law set forth therein are equally applicable in the instant case. For that reason the Court feels that it is unnecessary to extend this discussion by further citation of authority, and the rules of law outlined in Dinkelspiel v. Weaver, supra, should be applied to the facts in the instant case.

All the necessary elements of a preference have been clearly established in the instant case except two, i. e., (1) insolvency of the debtor at the time of the transfer, and (2) that the transferee or his agent knew or had reasonable cause to believe that the debtor was insolvent at the time of the transfer. Under the view that the Court takes of the case, it is unnecessary to decide whether G. G. Roberts was in fact insolvent at the time of the transfer to Wilcox, and the remainder of the discussion will be devoted to the question of whether the defendant had reasonable cause to believe Roberts to be insolvent when the transfer was made.

It is true that Roberts had become delinquent in payment for gasoline pur-

chased from Wilcox, and that this condition excited some apprehension among defendant's representatives. But this fact must be viewed against the background of what the Wilcox men discovered upon making an investigation in the town where Roberts operated his business. Roberts was involved in domestic difficulties so serious that he considered it prudent to conceal himself for a period during which he was unable to devote any time to his business. His accounts receivable had not been collected, and he assured Murrell and Davis that when this was done he would be able to pay Wilcox, which, in fact, he did.

■ The Wilcox men did not accept Roberts' own statements as to his financial condition without further investigation. They consulted three different bankers with whom Roberts did business, and were assured in each case that he was a dependable credit risk. They checked the public records and talked with retailers with whom Roberts dealt. From none of these sources of information was there any hint of impending financial disaster. If the facts and circumstances which came to the knowledge of the Wilcox agents were sufficient to put them upon inquiry, the investigation they conducted discharged the burden which such circumstances would place upon prudent and ethical business men.

■■ In view of the foregoing the Court is of the opinion that if Roberts was in fact insolvent at the time of the payments to Wilcox, the defendant's agents did not have reasonable cause to believe him to be such. It follows, therefore, that the payments complained of were not preferences within the meaning of the Bankruptcy Act, and that the complaint of plaintiff should be dismissed.

### Conclusions of Law

1.

■ The Court has jurisdiction of the parties to and the subject matter of this cause of action.

2.

The payment to Wilcox Oil Company of $10,117.55 by G. G. Roberts did not constitute a preference within the meaning of Section 60 of the Bankruptcy Act, and therefore the complaint of the plaintiff should be dismissed.

A judgment in accordance with the above should be entered.