Howard RUBIN, as Trustee in Bankruptcy of Max Joseph & Son Poultry Co., Inc., Plaintiff,

v.

DELAWARE MILLS, INC., Defendant.

Civ. A. 5957.

United States District Court
N. D. New York.

July 29, 1958.

Chernin & Gold, Binghamton, New York, Widett & Kruger, Boston, Mass. (Charles Keane, Binghamton, N. Y., Robert Robinson, Boston, Mass., of counsel), for plaintiff.

Harrison, Coughlin, Dermody & Ingalls, Binghamton, N. Y. (George G. Coughlin, Binghamton, N. Y., of counsel), for defendant.

FOLEY, District Judge.

This action was tried by the Court upon the waiver by the parties of a jury trial of the factual issues. It is one to set aside and void an alleged preferential transfer of property from the named bankrupt company to the defendant corporation under the pertinent provisions of Sections 60, sub. a(1) and 60, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 96, subs. a(1), b. The complaint demands money judgment as relief because the property involved in the transfer, a flock of chickens numbering approximately 11,000 at the time of transfer, after diminishing to 8,786 birds in a three-week period, was sold in two sep-

arate lots by the defendant company to Swift & Company.

Much has been written on the subject of preferential transfers under the cited provisions of the Bankruptcy Act, particularly "the reasonable cause to believe" principle, but there is no legal yardstick of set application to be evolved from such writings. It is clear, however, that decision must rest upon the particular factual situation presented. McDougal v. Central Union Conference Ass'n, 10 Cir., 110 F.2d 939, 941; Salter v. Guaranty Trust Co. of Waltham, D.C., 140 F.Supp. 111, 113. The contest here does not include all the elements provided by the statute to sustain preference because several are admitted and several are not too vigorously disputed. The two substantial issues raised by the evidence in this regard are whether or not Max Joseph & Son Poultry Co., Inc., ultimately a bankrupt, was actually insolvent under the terms of the Bankruptcy Act at the time of the transfer, and whether or not at the time the transfer was made the defendant had reasonable cause to believe that the Joseph Company was insolvent. Section 1 (19) of the Bankruptcy Act, 11 U.S.C.A. § 1(19); Dinkelspiel v. Weaver, D.C., 116 F.Supp. 455, 461; Section 60, sub. b of the Act.

█ █ It would seem that the question of solvency or insolvency at a particular time would not be a difficult one, particularly where as here, bankruptcy schedules of liabilities and assets were filed by the Joseph Company listing total debts and liabilities in the amount of $199,060.25 against assets of $37,229.16. But the bankruptcy proceedings were quite unusual and these schedules were not filed until April 8, 1954, long after the crucial date of June 10, 1953, when a bill of sale was executed by the Joseph Company to the defendant transferring title to the chickens. The bankruptcy proceedings were initiated by the filing of an involuntary petition in bankruptcy by a single creditor to which the Joseph Company filed an answer contesting the charge of bankruptcy. A special Master was appointed and although the record is somewhat hazy, it seems that the involuntary petition, agreed to be defective for technical reasons, resulted in the consent to the admission and adjudication of bankruptcy by the Joseph Company on April 24, 1954. (R. 61, 62, 63, 64.) Despite this result, much time transpired between the filing of the involuntary petition on July 3, 1953, and the appointment of this Plaintiff-Trustee, first as Receiver February 16, 1954, and as Trustee April 23, 1954. The Joseph Company remained in control of its properties until at least February 16, 1954, although the business closed down at the end of June, 1953. I agree with the Plaintiff-Trustee there should be liberality as to the admissibility of evidence offered to show the financial condition at a specific time which would allow the drawing of logical and reasonable inferences, and such approach is warranted by the reasoning of the Court of Appeals of this Circuit. Margolis v. Gem Factors Corp., 2 Cir., 201 F.2d 803, 804; Collier on Bankruptcy, Vol. 1, 14th Ed. pages 126, 127. But here there are many circumstances that seriously impair the weight and quality of the bankruptcy schedules outside of the suspicions generated by mere reading of the schedules themselves. The dates for the considerable debts are all set forth as incurred during April-May-June, 1953, without specified dates, and at the end of such listing it is stated that such lack of date is due to inability in locating bills or books of the corporation. Another startling example that gives pause is the listing of Clarence Joseph, President of the Bankrupt Company in 1953, for a loan in the amount of $87,856.16. Clarence Joseph testified at this trial and did not profess to be too familiar with the financial affairs and books of the corporation (R. 176–179), and admittedly received preferential payment by checks in the amount of $30,000 from the company as advances during the four-month period before the filing of the involuntary petition in bankruptcy. There are other important factors to

weigh and analyze to decide what should be a simple aspect of the case, but I do not intend to sink too deep into this dilemma, because in my judgment the Plaintiff-Trustee, from the evidence, does not carry the necessary burden to satisfy me as to the second phase, namely, that at the time of the transfer June 10, 1953, the defendant company, through its officers and agents, had reasonable cause to believe that the Joseph Company was insolvent. (Vol. 3 Collier, 14th Ed. page 1003.)

There are several cases in this Circuit which I must accept as my guide in the search for the determination as to whether reasonable cause to believe existed as to insolvency. Pender v. Chatham Phenix National Bank & Trust Co., 2 Cir., 58 F.2d 968, 970; Margolis v. Gem Factors Corp., 2 Cir., 201 F.2d 803, 804; Marks v. Goodyear Rubber Sundries, Inc., 2 Cir., 238 F.2d 533. The tests are: Would the circumstances involved raise more than suspicion of danger and would the facts of the situation brought to the attention of the creditor at the time of the transfer be such as to incite a man of ordinary prudence to an inquiry? I do not think the Plaintiff-Trustee has proven that type of facts and circumstances existent as to warrant such conclusion either directly or by fair inference.

Before June 9th or 10th, the critical dates when Ryder, a man of many capacities although primarily working for Joseph at the time, contacted Delaware Mills, I find nothing at all in the evidence which tends to show that Delaware Mills should have been suspicious of the financial affairs of the Joseph Company. In fact, the evidence tends the other way. Delaware had done business the year before in providing feed to Joseph and had been paid, although the payments were delayed. Joseph had held itself forth as an old established poultry processing firm since 1914. Two financial statements were furnished to Delaware in such form as to indicate a successful business operation. (Defendant's Exhibits B, C.) Delaware did not accept these statements without correspondence requesting further clarification as to certain parts of the last financial statement. (Plaintiff's Exhibit 7.) Most important, during April 1953, Delaware gave favorable information to a friendly competitor concerning the credit standing of Joseph (Defendant's Exhibit J), which impresses me very much that at that time Delaware thought it was doing business with a good, sound concern. There is nothing in the evidence which indicates to me any alarming information that should have made Delaware suspicious of Joseph during this period prior to June 9 and 10. Even the belated bankruptcy schedules do not show any large tax or wage payments due, which is the usual situation when a business is beginning to falter. The fact that Delaware did not persist in the personal guarantee of the account by Clarence Joseph as requested persuades me further that Delaware was content with the corporation credit alone. Nor is there shown any condition at all, in my judgment, that should have made Joseph suspect to Delaware as to pending insolvency before the telephone call from Ryder.

The call from Ryder on or about June 9 is the only element worthy of consideration as to its possible impact to begin to put Delaware on notice that something was wrong. However, the most that can be drawn from Ryder's testimony is that Joseph had not paid farmer Fairchild for some time and owed Ryder himself about $400. But connected with this was the paramount and repetitious information to Delaware that the birds were in bad shape, sick and dying, and that the attitude of Clarence Joseph was to abandon them. (R. 130, 133, 137, 139, 145, 146, 147.) It is clearly established in the evidence that the condition of the flock was just as Ryder stated it. (Defendant's Exhibit G, R. 117, 120.) With all this urgency and need for quick decision, it is my finding that Delaware, in arranging for the bill of sale from Joseph to it in release of the debt for feed, made an honest and justifiable decision under the circumstances in good

faith to salvage what it could without any thought or cause to believe insolvency on the part of Joseph. There is sufficient in the testimony to support the conclusion by Delaware that Joseph was just abandoning a bad business deal with the misfortune of a sick flock. Delaware was in a position that it had to act quickly or the chickens into which its feed had gone would be dead, and all Delaware would have left would be a troublesome and precarious litigation against Joseph under the terms of the letter agreement dated April 20, 1953, "with settlement of account on sale of the flock" in a transaction that has some aspects of a joint venture. In my judgment these facts counteract the claim of the Plaintiff that Delaware was impelled to effectuate the transfer because of a well-grounded belief that Joseph on June 10, 1953, was insolvent.

The facts and circumstances here do not approach the strong situations which impose notice of insolvency as fact upon a creditor or at least the duty of inquiry. Authorities where such transfers have been struck down demonstrate the need for such underlying strength. Pender v. Chatham Phenix National Bank & Trust Company, supra; Margolis v. Gem Factors Corp., supra; Marks v. Goodyear Rubber Sundries, Inc., supra; Prudential Insurance Company v. Nelson, 6 Cir., 96 F.2d 487, 491; Bergougnan Rubber Corp. v. Bell, 6 Cir., 8 F.2d 702. Some authorities which support the position I take are Grant v. First National Bank, 97 U.S. 80, 24 L. Ed. 971; McDougal v. Central Union Conference Ass'n, 10 Cir., 110 F.2d 939; Cumberland Portland Cement Co. v. Reconstruction Finance Corp., D.C., 140 F. Supp. 739, 751; Dinkelspiel v. Weaver, D.C., 116 F.Supp. 455; Salter v. Guaranty Trust Co., D.C., 140 F.Supp. 111.

This opinion constitutes my findings of fact, and my conclusion of law is that the plaintiff has not borne the necessary burden to prove that on June 10, 1953, at the time of the transfer, the defendant had reasonable cause to believe that Max Joseph & Son Poultry Co. Inc. was insolvent. Therefore, the complaint is dismissed and judgment shall enter in favor of the defendant to such effect. See Matteson v. United States, 2 Cir., 240 F.2d 517.

It is so ordered.

The exhibits shall be returned to the respective attorneys who introduced them.