**John D. VARNELL, as Trustee in Bankruptcy of S & S Electric Company, Bankrupt,**

v.

**GOOD–WYNN ELECTRICAL SUPPLY COMPANY.**

Civ. A. No. 12106.

United States District Court,
N. D. Georgia,
Atlanta Division.

Nov. 25, 1969.

Schwall & Heuett, Thomas C. Jones, Jr., Atlanta, Ga., for plaintiff.

Allen & Baker, Decatur, Ga., for defendant.

### ORDER

ALBERT J. HENDERSON, Jr., District Judge.

This is a suit by the trustee in bankruptcy to avoid a preferential transfer, under § 60 of the Bankruptcy Act, 11 U. S.C. § 96. The primary issue before the court, on the plaintiff trustee's motion for summary judgment, is whether the defendant was on inquiry notice of the bankrupt's insolvency. The court holds that it was.

S & S Electric Co., Inc., the bankrupt, was an electrical sub-contractor. During the period of this suit, it obtained its materials primarily from the Good-Wynn Electrical Supply Company, the defendant in this case. The president of Good-Wynn, Mr. Charles H. Wynn, stated by affidavit, that, prior to February, 1968, Good-Wynn had sold only a few orders of materials to S & S. Further, S & S had bought materials in May, 1967, December, 1967, and January, 1968, and the bills were paid without delay. In January, 1968, for example, S & S bought materials totaling $1,005.49, and paid for these materials within the Good-Wynn discount period, thereby obtaining a discount on the materials. Beginning on or about February 13, 1968, S & S increased its purchases from Good-Wynn, to the extent that by April 19, 1968, it had increased its account to the amount of $10,769.95.

In his affidavit, filed June 2, 1969, Wynn stated that he had talked very little personally with Smith during the times he made purchases at the Good-Wynn offices. He stated, however:

I knew that S & S Electric Co. was slow with its account, but also knew that the company had more than $6,-000.00 coming from several jobs with the Carter-Bell Corporation. I had never seen a balance sheet on S & S Electric Company and did not know of the amount of its assets or liabilities either prior to April 16, 1968, or after

until [sic] I received notice of the filing of the petition in bankruptcy.

George S. Smith, president of the S & S Electric Company, Inc., did not discuss with me prior to April 16, 1968 that his company owed more money than it had assets, and that other material suppliers were not furnishing him with any more material on open account because he was so far behind with them, and that they had closed his open account, putting him in a position to buy on C.O.D. only. I learned of the financial condition of S & S Electric Company several days prior to the filing of the petition, and at that time told George Smith that I could not sell any more material to him. At that time Smith said his liabilities exceeded hs assets and that I was "forcing him to go under".

Wynn further stated that he did not know that S & S Electric Company was insolvent on April 16, 1968, when the payment by check of $1,003.00 was made on the S & S account. He then stated, by way of conclusion, that he had no reason to believe that S & S was insolvent. He offers as evidence of his lack of knowledge the fact that Good-Wynn continued to sell supplies to S & S through April 19, 1968, only three days after the subject payment.

However, also in evidence in the case is a transcript of proceedings heard before the Honorable A. David Kahn, Referee in Bankruptcy for the Northern District of Georgia, held on June 27, 1968, in Case No. 62367, In re S & S Electric Co., Inc. (hereinafter referred to as Transcript). On direct examination by his counsel, Mr. Verlyn C. Baker, Mr. Wynn stated, in pertinent part:

Q And, Mr. Wynn, did you have any conversations with Mr. George Smith concerning three jobs which are the subject of this hearing?

A Yes.

Q When did this take place?

A Mr. Smith called me. I had done business with Mr. Smith over a year ago on $200.00 that he like to

have never paid me, and I told him at that time I couldn't do anything else with him. And he started calling me wanting to buy materials. He called me at home at night and in the morning and I felt sorry for Mr. Smith. So after talking to him quite a few times I decided I would go ahead and sell him. I knew he was in this bad shape. And this is the way we got started. He came to me and wanted to buy this material.

\* \* \* \* \* \*

Q Mr. Wynn, I'll ask you whether you had any discussion with Mr. Smith concerning the application of payments to which items of his account.

A Yes, sir. I talked to him quite frequently about this.

Q What, if any, discussion did you have with him?

A When we started off, I told him that I would have to have my money. I'm a small outfit. And he told me, he said, "When I finish a job or get it roughed in certain stages, I will make a draw." And he said "When I make this draw, I will pay you." And I never did get this.

Q What, if any, discussion did you have with Mr. Smith concerning the materials for which this check of $1300 was paid?

A Well, I kept calling and kept calling, and he kept saying he did not get a draw, he did not have any money. And some way I found out that he had gotten a draw and he told me that he would pay me when he got these draws. And I found out that he was putting it on labor instead of material. So I called him up and he said, "I will have you a check on Friday." My wife was also calling. He didn't come. And about two weeks later he brought this check in. I was not there. He gave it to my wife.

And I asked my wife, "Did he say apply to anything?"

A And she said, "No." He said, "Here's a $1300 check. I will have you some more money shortly."

Q Did you at that time determine how much he owed you for jobs other than the 7–11 Stores?

A At that time I had been going over his file. I was real worried about the whole situation. I knew everything he owed me and where it was going and so forth and so on. Yes, sir.

Transcript, pp. 34–37.

Also in the transcript of the bankruptcy proceedings is found the testimony of Mr. George S. Smith, President of S & S, which generally agrees with the Wynn testimony, to-wit, that S & S was continually in trouble during the period of the suit. For example, S & S was periodically required to make draws from its primary contractor, the Carter-Bell Corporation, in order to meet demands for labor and material. Smith's statement concerning his financial condition on the date of the $1300 check was as follows:

Well, sir, it wasn't too good. We were relying on the draws from the various construction jobs at that time to make our operating capital, our payroll and so forth. We were not in the best financial shape at that time.

Q Well, at that time, I'll ask you, did you owe more money than you had assets?

A Yes, sir, I'm afraid we did.

Transcript, p. 22.

In answer to a question from the court, Smith stated that S & S was so far behind with its other accounts that the other accounts had closed and that S & S could only purchase from the other accounts on a C.O.D. basis. Smith further stated that he was unable to meet other S & S business obligations as they accrued. Transcript, p. 23.

Smith stated that the approximate amount of his other accounts was about

$400 to Central Electric and about $50 or $55 to Westinghouse. Transcript, p. 15. He further stated that all through the last part of March and the first two weeks of April that S & S had a number of checks bouncing from various payees. Further, S & S had to pay its employees by cash because its checks kept bouncing. Transcript, p. 27.

In Good-Wynn's response to plaintiff's motion for summary judgment, it raises three issues. The first and primary issue has already been stated by the court, to-wit, whether under § 60(b) defendant was on inquiry notice that the bankrupt was insolvent at the time of the payment of the $1300 check, April 16, 1968. Good-Wynn also questions whether, under § 60 (a), the bankrupt was insolvent on the day of transfer of the check. Finally, the third question is stated " * * * whether defendant received a better percentage of his debt than he would otherwise receive."

§ 60 of the Bankruptcy Act, 11 U.S.C. § 96, states, in pertinent part:

> § 60. Preferred Creditors. a. (1) A preference is a [1] transfer, as defined in this Act, of any of the property of a debtor [2] to or for the benefit of a creditor [3] for or on account of an antecedent debt, [4] made or suffered by such debtor while insolvent and [5] within four months before the filing by or against him of the petition initiating a proceeding under this Act, [6] the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.
>
> \* \* \* \* \* \*
>
> b. [7] Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made reasonable cause to believe that the debtor is insolvent.

§ 1 of the Bankruptcy Act, 11 U.S.C. § 1 states, in pertinent part:

> (19) A person shall be deemed insolvent within the provisions of this Act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts.

■ First, was the bankrupt insolvent on the date of the transfer, April 16, 1968? The bankrupt was certainly unable to meet his obligations, i. e., payrolls and accounts, as they matured. The essence of Smith's testimony was that the bankrupt was in considerable financial hot water on April 16. Further, on the date of bankruptcy, April 30, 1968, some 14 days later, the bankrupt was in a state of hopeless insolvency. Its schedules revealed total assets of $12,300.60 and total liabilities of $48,547.77. Both the financial condition on the date of the adjudication in bankruptcy, and the testimony of Smith, are evidence that the bankrupt was insolvent on April 16, 1968. See Dinkelspiel v. Weaver, 116 F.Supp. 455, 461 (W.D.Ark.1953). Further, the interval between the transfer and the adjudication in bankruptcy was only two weeks, and, by affidavit of Mrs. George S. Smith, bookkeeper of the bankrupt, it is shown that no significant increase or decrease occurred in either the assets or liabilities of the bankrupt from April 16 to April 30, 1968. See International Minerals & Chemical Corp. v. Moore, 361 F. 2d 849, 854 (5th Cir. 1966); Dabney v. Chase National Bank of City of New York, 98 F.Supp. 807, 842–843 (S.D.N.Y. 1951); Brown Shoe Company v. Carns, 65 F.2d 294 (8th Cir. 1933) (twenty days); Williams v. Plattner, 46 F.2d 467 (E.D.N.Y.1931) (4–6 days); Irving Trust Company v. Roth, 48 F.2d 345, 346 (S.D.N.Y.1930) (one month).

Moreover, the defendant's "Tender of Evidence" addresses itself only to the issue of the defendant's reasonable cause to believe plaintiff was insolvent. As to the issue of insolvency as of the date of transfer, and as to the percentage-of-

the-debt issue, the defendant has restricted himself to a legal argument, asserting that plaintiff has failed to carry his burden of proof on these issues.

Therefore, as to the insolvency issue, the court has ample evidence to conclude that the bankrupt was insolvent, *i. e.*, that its liabilities exceeded its assets, on the date of the transfer. The court so holds.

■ As stated by defendant, the question whether defendant received a better percentage of his debt than *he* would otherwise receive is not an issue cognizable under § 60(a) of the Bankruptcy Act. However, the court assumes that the defendant intended to question whether the effect of the transfer would be " * * * to enable such creditor to obtain a greater percentage of his debt than *some other creditor of the same class*". (Emphasis added.) The evidence is that all of the S & S creditors, other than Good-Wynn, had placed S & S on a C.O.D. basis because it was unable to make any payment to them. A number of checks had bounced during this period. These facts enable the court to conclude that the bankrupt's estate was diminished by the $1300 check to Good-Wynn. In addition, the uncontroverted affidavit of Ken Weatherwax, Vice-President of Diamond Electric and Supply Corporation, states that Diamond Electric was a general unsecured creditor of S & S, and that it received no payment on the S & S account during the four months preceding April 30, 1968. From this evidence, the court concludes that Good-Wynn would receive a greater percentage of its debt than at least one creditor of the same class, Diamond Electric.

In this connection, the court notes Fed. R.Civ.P. 56(e) which requires that, when a motion for summary judgment is made as provided for, the opposite party may not rest upon his pleadings, but must respond, by affidavit or otherwise, setting forth specific facts showing that there is a genuine issue for trial. This the defendant has not done, choosing merely to state, as a conclusion, that plaintiff has failed to bear his burden of proof on this issue. Therefore, the court holds that the $1300 payment diminished the bankrupt's estate and would have entitled Good-Wynn to a greater percentage of its debt than Diamond Electric and Supply Corporation, "some other creditor of the same class".

■ Finally, the court addresses itself to the question of whether the creditor had reasonable cause to believe that the debtor was insolvent. Generally, Smith's testimony was to the effect that Wynn actually knew of his insolvency, or at least that he was having extreme financial difficulty. However, this is substantially denied by Wynn. Therefore, this question would be for the jury were it not for the testimony of Wynn at the June 27, 1968, hearing before Referee Kahn. At the hearing, Wynn stated that he had had unsatisfactory dealings with Mr. Smith before. Over a year ago, Smith had maintained a debt of $200.00 for a long time, long enough for Wynn to tell him that he could no longer do business with him. But Wynn testified that Smith began calling him, wanting to buy materials. These calls were received at home at night, and in the morning. He further stated that he felt sorry for Mr. Smith, and that, "after talking to him quite a few times, I decided I would go ahead and sell him. I knew he was in this bad shape." Transcript, p. 34. Next, Wynn stated that he talked with Smith "frequently" concerning the application of payments to items of his account. He described the arrangement made with Smith, that he would be paid each time that Smith received a "draw" from a contractor, but concluded that he never did receive payments on any draw. Finally, he stated:

> Well, I kept calling and kept calling, and he kept saying he did not get a draw, he did not have any money. And some way I found out that he had gotten a draw and he told me that he would pay me when he got these draws. And I found out that he was putting it on labor instead of material. So I

called him up and he said, "I will have you a check on Friday." My wife was also calling. He didn't come. We kept calling and calling. And about two weeks later he brought this check in.

\* \* \* \* \* \*

At that time I had been going over his file. I was real worried about the whole situation. I knew everything he owed me and where it was going and so forth and so on. Yes, sir.

Transcript, p. 36.

Were these facts sufficient to put an intelligent businessman on inquiry notice of what the questions to Smith about the insolvency of his company might have discovered? First, Smith had a history, long-standing with Wynn, of slow payment. Nevertheless, Wynn might have been lulled by the prompt payment in January, February and March of the small amounts. However, the Smith account increased rapidly thereafter. Payments stopped, apparently just as dramatically. Displaying apprehension, Wynn began calling Smith. He then found out that Smith had violated the agreement between them and had not paid him after receiving a draw from a contractor. In Wynn's words, he "kept calling and kept calling". His wife was also calling. Despite a promise to come in on a Friday, presumably about the first of April, Smith did not come, but the calls continued. The check was not received until a full two weeks later, on April 16, 1968. Surely, at some prior time to the receipt of this check, an intelligent businessman would have reasonable cause to inquire about the financial condition of S & S. In fact, Wynn's assertion that he did not know that S & S was insolvent on April 16, 1968, in the light of the frequency of the phone calls both he and his wife had made to Smith during the previous weeks, defies the court's credulity. Accordingly, this issue need not be left to the jury, because the court holds, under § 60(b), that Wynn had reasonable cause to believe that S & S was insolvent at the time of the transfer. See Mizell v. Phillips, 240 F.2d 738,

741–42 (5th Cir. 1957); Lang v. First National Bank in Houston, 215 F.2d 118 (5th Cir. 1954).

There is no dispute as to the remaining elements of § 60(a). There was a (1) transfer of the property of a debtor (2) to or for the benefit of a creditor (3) for or on account of an antecedent debt. Further, (4) this transfer was made within four months before the filing of the voluntary petition.

In light of the findings of this court, all of the elements of § 60 coalesce. Therefore, the motion for summary judgment is hereby granted for the trustee against the defendant, with interest from September 18, 1968. Costs to the defendant.