In the Matter of ENTERTAINMENT IN-
CORPORATED t/a Pat's One Stop
and Bandbox.

No. BK–1030–72–R.

United States District Court,
E. D. Virginia,
Richmond Division.

April 15, 1974.

Watson M. Marshall, Trustee in Bankruptcy, Eddie Cantor, for Watson Marshall, Trustee in Bankruptcy, Richmond, Va.

Robert N. Johnson, Richmond, Va., for Entertainment, Inc.; C. Cotesworth Pinckney, Richmond, Va., for Warner Elektra Atlantic Distributing Corp.

## MEMORANDUM

MERHIGE, District Judge.

Warner Elektra Atlantic Distributing Corporation (WEA) petitions the Court for a review of an order in this cause by the Bankruptcy Judge, dated October 29, 1973. Jurisdiction is attained by virtue of 11 U.S.C. § 67(c).

Basically, the facts are as follows:

In July, 1971, WEA entered into a business relationship with the Bankrupt whereby the Bankrupt would order, and WEA would supply, on an open account, sixty-day credit basis, phonograph records and recorded tapes. A security agreement, dated October 2, 1971, was entered into granting WEA a security interest in all WEA merchandise sold to the Bankrupt, and the proceeds thereof, which security agreement was filed with the Chancery Court in Richmond on October 12, 1971. A financing statement purporting to cover such collateral was not filed with the Virginia State Corporation Commission until August 10, 1972.

Some time during the month of August, 1972, the total outstanding indebtedness of the Bankrupt, then approximately $94,000.00, was converted from an accounts receivable indebtedness to a notes receivable indebtedness by the execution of five notes with maturities of October 1, 1972, November 1, 1972, December 1, 1972, January 1, 1973, and on a demand basis for the remainder. Simultaneously with the execution of the notes, and to secure their repayment, the Bankrupt executed another security agreement, dated August 14, 1972, granting to WEA a security interest in all of the Bankrupt's present and future accounts, contract rights, chattel paper and other receivables. A financing statement purporting to cover such collateral was filed with the Virginia State Corporation Commission on September 8, 1972, and with the Clerk of the Chancery Court in Richmond on that same date.

On or about August 18, 1972, WEA altered its policy from that of selling on open account to the Bankrupt to a policy of C.O.D. sales only.

On November 28, 1972, the Bankrupt filed an original petition with this Court, instituting Chapter XI proceedings. Subsequently, on December 7, 1972, Entertainment, Incorporated, was adjudicated a bankrupt. The previously appointed receiver, Watson M. Marshall, was thereafter appointed Trustee in Bankruptcy ("Trustee").

On March 6, 1973, WEA filed a petition alleging that it had a security interest in various merchandise inventory which had been previously sold by WEA

to the Bankrupt, the proceeds of that inventory, and also claiming a security interest in the accounts receivable and contract rights of the Bankrupt. WEA prayed that its security interests be found valid and enforceable, and that it receive all funds paid to the Trustee on account of his sale of inventory previously sold to the Bankrupt by WEA, and that WEA receive the proceeds of the accounts receivable of the Bankrupt, to the extent of $82,007.18, that being the amount of debt claimed by WEA.

In April, 1973, the Trustee filed an Answer and Counterclaim, alleging that the claimed inventory security interest was unperfected under the Virginia Uniform Commercial Code, and, as such, was subordinate to the rights of the Trustee under Section 70 of the Bankruptcy Act. Additionally, the Trustee alleged that if the claimed inventory security interest was perfected at all, it, together with the claimed accounts receivable security interest, was perfected within four months of bankruptcy and, as such, those security interests constituted preferences voidable by the Trustee under Section 60 of the Bankruptcy Act. Finally, the Trustee alleged in his Counterclaim that approximately $25,050.55 of payments were made by the Bankrupt to WEA during the four months preceding bankruptcy, for or on account of an antecedent debt or debts, while the Bankrupt was insolvent and while WEA had reasonable cause to believe the Bankrupt was insolvent, thus enabling WEA to obtain a greater percentage of its debt than other creditors of the same class, and that each such payment constituted a voidable preference under Section 60 of the Bankruptcy Act.

A hearing on the matter was held on June 21, 1973, before the Honorable Henry D. Evans, Bankruptcy Judge, who made the following formal findings of fact:

## FINDINGS OF FACT

1. On October 2, 1971, a security agreement was executed between Bankrupt and WEA granting Petitioner a security interest in all of Bankrupt's inventory sold by WEA to it. The purpose of the agreement was to secure the payment of purchase money credit. The agreement described in detail various merchandise covered by the agreement by means of attached invoices, and covered any after-acquired WEA inventory, and the proceeds of all of the foregoing. This security agreement was filed with the Chancery Court in Richmond, Virginia on October 12, 1971.

2. Subsequently, WEA and Bankrupt executed a financing statement as required by the Virginia Uniform Commercial Code (hereinafter referred to as the "Code"), covering such collateral, which was filed with the Virginia State Corporation Commission on August 10, 1972.

3. Some time within the first two weeks of August, 1972, the Bankrupt's then total outstanding indebtedness to WEA of $94,105.30 was converted from an account receivable to a note receivable by the execution of five notes, maturing respectively on October 1, November 1, December 1, of 1972, January 1, 1973, and on a demand basis for the remainder. At the time of conversion of accounts to notes, the indebtedness was antecedent debt.

4. On August 14, 1972, WEA and Bankrupt executed another security agreement covering all of the Bankrupt's present and future accounts, contract rights, chattel paper and other receivables. The purpose of this agreement was to secure the payment of the above described notes, and any other indebtedness of the Bankrupt to WEA.

5. Financing statements covering the transaction described in No. 4, *supra*, were thereafter executed by WEA and Bankrupt and filed with the Virginia State Corporation Commission and with the Chancery Court of the City of Richmond on September 8, 1972.

6. On November 28, 1972, an original petition instituting proceedings under Chapter XI of the Act was filed in this Court by the Debtor, Entertainment Incorporated, and a receiver was appointed; on December 7, 1972, Debtor was adjudicated a bankrupt and thereafter the receiver was appointed trustee to administer the estate.

7. From at least August 1, 1972, until its final adjudication as a bankrupt, Entertainment Incorporated was insolvent in that its liabilities exceeded the fair market value of its assets, and, throughout this period, WEA knew of this insolvency, or certainly knew enough to put it on notice to make inquiry which would have revealed insolvency.

8. At all times relevant to the discussion herein, the Bankrupt had creditors, other than WEA, of the same class as WEA.

In addition, the Bankruptcy Judge's opinion clearly reflects that the following findings were made with respect to the trustee's counterclaim regarding the cash payments and return of goods by the Bankrupt to WEA within four months of bankruptcy:

1. Payments totalling $16,342.16 were actually paid by the bankrupt on C.O.D. transactions.

2. The payment of $2,708.39 on August 1, 1972, was on account for goods actually delivered in March, 1972.

3. The payment of $6,000.00 on or about October 4, 1972, was credited to a note which had matured on October 1, 1972 and covered a prior indebtedness.

4. The payment of $1,400.00 during September, 1972, was on account, for goods delivered prior to that time.

5. During September, 1972, the Bankrupt returned to WEA goods valued at $2,000.00.

Based on his findings, the Bankruptcy Judge reached the following conclusions:

1. Because no financing statement had been filed with the Virginia State Corporation Commission covering the collateral secured by the October 2, 1971 security agreement, as required by § 8.-9–401(1)(c), Va.Code (1950), as amended, until August 10, 1972, WEA's secured interest in that collateral was not perfected, if at all, until that later date.

2. At all times prior to the perfection of the aforementioned security interest, said interest would have been subordinate to the position of the trustee for the Bankrupt by virtue of § 8.9–301(3), Va.Code (1950), as amended, and § 70(c) of the Bankruptcy Act, 11 U.S.C. § 110(c).

3. WEA's perfection of the aforementioned security interest on August 10, 1972, if at all, constituted a preferential transfer under § 60(a)(1) of the Bankruptcy Act, 11 U.S.C. § 96(a), and therefore voidable by the trustee in bankruptcy under § 60(b) of the Bankruptcy Act, 11 U.S.C. § 96(b).

4. WEA's secured interest in collateral under the August 14, 1972 security agreement, perfected on September 18, 1972, was also a preferential transfer under § 60(a)(1) of the Bankruptcy Act, which was voidable by the trustee in bankruptcy under § 60(b).

5. Except for the $16,342.16 paid by the Bankrupt on C.O.D. transactions, all of the payments made to WEA within four months of bankruptcy—totalling $12,108.39, including the goods returned —were also preferential transfers under § 60(a)(1) of the Bankruptcy Act, and therefore voidable by the trustee in bankruptcy under § 60(b).

Accordingly, an order was entered by the Bankruptcy Judge denying WEA's request that its claim of $82,807.18 be allowed as a secured claim. The order also granted to the trustee in bankruptcy a judgment against WEA in the amount of $12,108.39, plus interest, on its counterclaim.

■ In its petition for review, WEA has raised several issues which will be discussed *in seriatim*. However, the Court would note from the outset that,

with respect to several of the issues raised, the findings of the Bankruptcy Judge are to be left standing unless they are found to be clearly erroneous. In re Panama Airways, Inc., 429 F.2d 646 (5th Cir. 1970); In re Ostrer, 393 F.2d 646 (2d Cir. 1968); Shainman v. Shear's of Affton, Inc., 387 F.2d 33 (8th Cir. 1967); Girsh v. Katchen, 382 F.2d 560 (10th Cir. 1967). In short, such findings will be set aside only if there is lacking substantial evidence in the record on which they may rest. Woodson v. Gilmer, 420 F.2d 378 (4th Cir. 1970), cert. den., 399 U.S. 928, 90 S.Ct. 2244, 26 L.Ed.2d 795 (1970).

## I.

The first issue raised is whether the Bankruptcy Judge was clearly in error in finding that the Bankrupt had been insolvent on August 1, 1972, the date of the first alleged preferential transfer, and at all relevant times thereafter. Cf. § 60(a)(1) of the Bankruptcy Act, 11 U.S.C. § 96(a)(1).

Under the Bankruptcy Act, 11 U.S.C. § 1(19), a person is deemed insolvent "whenever the aggregate of his property . . . shall not at a fair valuation be sufficient in amount to pay his debts."

It is true that, in this case, there was no direct evidence of the Bankrupt's insolvency on the critical dates, based on a definitive analysis of the Bankrupt's financial records. However, insolvency need not be proved by direct evidence. Indeed:

It may, and in many cases must, be proved by the proof of other facts, from which the ultimate fact of insolvency may be presumed or inferred. Rosenberg v. Semple, 257 F. 72, 73 (3d Cir. 1919). See also, Collier on Bankruptcy, ¶ 1.19[5].

Accordingly, the courts have permitted reliance, by expert witnesses, in testifying as to solvency, on inventory estimates and appraisals relative to periods prior or subsequent to the crucial date. See, e. g., Abdo v. Townshend, 282 F. 476, at 480 (4th Cir. 1922).

Moreover,

. . . when the date is near and there is continuity or no change of position, the [Bankruptcy Judge] may, in addition to the opinion of experts, draw his own inferences from the wretched financial condition of the bankrupt at the time of adjudication and infer bankruptcy as of the prior date. In re Great Western Biscuit Co., 85 F.Supp. 314, 315 (S.D.Cal.1949). See also, Brown Shoe Co. v. Carns, 65 F.2d 294 (8th Cir. 1933); Dinkelspiel v. Weaver, 116 F.Supp. 455, 461 (W.D. Ark.1953).

Other items of evidence which may be relevant to the issue of insolvency were summarized in the case of In re Elmira Steel Co., 109 F. 456, 460–461 (N.D.N. Y.1901), as follows:

Inability to pay debts at a given time as evidence of prior insolvency during periods ranging from a few weeks to several months finds illustration in many cases . . . All this evidence of inability to pay debts, the suspension of business, and of negotiations looking to creditors permitting future operations by the company, was material and competent, and from it, in the absence of other evidence, the fact of insolvency could be found.

The credibility of witnesses who have testified either as to the ultimate fact of insolvency, or as to the evidentiary facts giving rise to an inference of insolvency, is always in issue, and such issue is particularly acute where there is conflicting testimony among the witnesses. However, as in other cases, the credibility of witnesses is a matter for resolution by the trier of fact, in this case, the Bankruptcy Judge. Meyer v. Dolan, 145 F.2d 880, 881 (2d Cir. 1944); In re Great Western Biscuit Co., 85 F.Supp. 314 (S.D.Cal.1949). It must therefore be presumed that any conflicts have been resolved in a manner which supports the Bankruptcy Judge's findings.

Examining the evidence which the Trustee put forth regarding the issue of insolvency at the times of the alleged preferences, the record discloses the following testimony. Karl Alsheimer, after being qualified without objection as an expert witness with a master's degree in business administration, with a major in accounting, and with about thirteen years' experience in the record business, testified regarding a conversation which he had with the branch manager of WEA during the first week of August, 1972. Hr. Tr. at 18–20.

In response to an inquiry regarding the possibility of taking back returns of merchandise to help the Bankrupt alleviate his financial difficulties, Mr. Alsheimer testified that the branch manager of WEA had stated that this would be impractical since there was very little inventory at the Bankrupt's warehouse in Richmond. Hr. Tr. at 20, 22. The branch manager of WEA testified on direct examination that he had indeed personally inspected the Bankrupt's warehouse in Richmond July 24 and 28, 1972, and had examined the inventory and stated that, "[i]n terms of inventory level, it seemed low to me." Hr. Tr. at 107. The Bankruptcy Judge himself made reference to Mr. Alsheimer's use of that knowledge in his testimony regarding insolvency. Hr. Tr. at 39.

The seeming disavowal by the branch manager of WEA of the preceding conversation (Hr. Tr. at 111–112) was retracted somewhat during cross examination by a confrontation with statements the branch manager had made at an earlier deposition regarding the same conversation. Hr. Tr. at 129–132.

With respect to the liabilities of the Bankrupt, Mr. Alsheimer testified that, during the August conversation with the branch manager of WEA, they both discussed their individual knowledge of the debts of the Bankrupt, both with their respective companies and with other creditors of the Bankrupt, and the total indebtedness was well in excess of a quarter of a million dollars. Hr. Tr. at 21.

The conclusion reached by the Trustee's expert witness was that "the liabilities [of the Bankrupt] exceeded the assets at that time [in August of 1972] by a ratio of two to one or more." Hr. Tr. at 23. On cross examination, in response to the question of how he arrived at his conclusion, the Trustee's witness responded as follows:

I have testified that in the hearing that evolved, from testimony that was given, from documents that were introduced, that I ascertained a figure of the bank account, a figure of the liabilities that was introduced in this Court in totals. I also have knowledge of the inventory. I had a very good estimate of it at the time. And balancing those factors, I came to the conclusion that insolvency existed, yes. Hr. Tr. at 26–27.

In response to the question of whether the Trustee's expert witness, in testifying that the assets were less than half of the liabilities, included the accounts receivable of the Bankrupt in the assets, Mr. Alsheimer, responding in the affirmative, stated that he took the highest accounts receivable figure for the Bankrupt from many pages of an IBM printout. Hr. Tr. at 35–36.

The fact that this conclusion by the Trustee's expert, Mr. Alsheimer, was based partially on his personal investigation of the Bankrupt's inventory levels as late as mid-October, 1972, is not fatal to the Bankruptcy Judge's finding that the insolvency existed as early as August 1, 1972. To reiterate, Mr. Alsheimer's testimony was that he estimated the ratio of liabilities to assets at "two to one or more." Hr. Tr. at 23. Even assuming this testimony was directly relevant only to the state of affairs as it existed in mid-October, 1972, the disparity was great enough, and the two and one half month time interval short enough, that it may have been proper for the Bankruptcy Judge to infer, on the basis of Mr. Alsheimer's opinion alone, that the ratio was at least greater than one to one on August 1, 1972, and at all relevant times thereafter.

In other words, the reasonable implications of Mr. Alsheimer's testimony were such that, in this case, the burden of going forward may properly have shifted at that point; and an inference of insolvency on the earlier date may have been permissible, absent a showing by the party claiming the Bankrupt's earlier solvency that changed circumstances had, in fact, occurred which had broken the continuity. But, see Dinkelspiel v. Weaver, 116 F.Supp. 455, 461 (W.D.Ark.1953), where the burden was placed on the party claiming insolvency on the earlier date to show that changed circumstances had not, in fact, intervened. However, Dinkelspiel v. Weaver, *supra*, is distinguishable from this case in that the record there had contained positive evidence of "a business which fluctuated rapidly;" which, in turn, suggested a very real possibility of changed circumstances during the crucial interval. 116 F.Supp. at 461. There is no like evidence in the record here.

Beyond that, there was indeed positive evidence in this case which suggests that the Bankrupt's financial condition had not changed significantly between August 1, 1972 and mid-October, 1972. As previously noted, there was testimony by WEA's own witness, Mr. Slaveter, that the Bankrupt's inventory levels had been low as early as late July, 1972. Hr. Tr., at 107. Mr. Slaveter also testified that at a July 24, 1972 meeting with the president of the Bankrupt, WEA was informed that the Bankrupt was attempting to contact all of its creditors with a proposal to reschedule the Bankrupt's accounts receivable indebtedness to a notes receivable indebtedness, and to have the creditors sell merchandise to the Bankrupt on a C.O.D. basis *in order that the Bankrupt could remain in business*. Mr. Slaveter further testified that, at that time, WEA would not have made further sales of merchandise to the Bankrupt except on a C.O.D. basis. Hr. Tr., at 92–94. (Emphasis added). This evidence of a continuous state of financial difficulty further supports the Bankruptcy Judge's inference of insolvency as early as August 1, 1972.

The petitioner introduced no positive evidence of the Bankrupt's solvency on August 1, 1972, or thereafter, which would have tended to rebut the inference drawn.

■ Taking into account all of the testimony as a whole, keeping in mind that it is for the Bankruptcy Judge to decide issues of credibility of the witnesses and relative weights to be accorded their testimony, and with due regard for the legal principles governing the proof of insolvency, as set forth above, it is clear to the Court that the Bankruptcy Judge's finding that the Bankrupt was insolvent on August 1, 1972, and at all relevant times thereafter, was amply supported by the record and is not clearly erroneous.

II.

The second issue raised is whether the Bankruptcy Judge was clearly in error in finding that WEA had sufficient notice of the Bankrupt's insolvency as early as August 1, 1972, the date on which the first allegedly preferential transfer took place. Assuming, for the moment, that error would be found as to the August 1, 1972 date, the issue would then turn on whether the finding was also erroneous as to each successive date on which an alleged preferential transfer took place.

■ The petitioner correctly asserts that § 60(b) of the Bankruptcy Act, 11 U.S.C. § 96(b), requires that the trustee, in order to avoid a preferential transfer, must show that the creditor had, at the time the alleged preference was made, "reasonable cause to believe that the Bankrupt was insolvent." See Aulick v. Largent, 295 F.2d 41 (4th Cir. 1961). Mere suspicion of insolvency is not sufficient. In re Markham, 254 F. Supp. 948 (W.D.Va.1966). However, it is not necessary that the creditor have had an actual belief that the Bankrupt was then insolvent. Rather, it is sufficient that the creditor or his agents

have had knowledge of such facts as would induce a person of reasonable prudence, under similar circumstances, to make an inquiry; and if such inquiry would have led to the development of facts essential to the knowledge of the insolvency, the creditor is chargeable with such knowledge. See Mayo v. Pioneer Bank & Trust Co., 297 F.2d 392, 394–395 (5th Cir. 1961). See also, In re Markham, *supra*; In re Cruff, 280 F. Supp. 846 (W.D.Va.1966); In re Vaughn Construction Co., 304 F.Supp. 1296 (W.D.Va.1969); 3 Collier on Bankruptcy, ¶¶ 60.52, 60.53, at 1055–59.

That the Bankruptcy Judge accurately perceived these general principles is clearly reflected in his memorandum opinion, at pp. 10–11. Beyond that, the Court has carefully reviewed the Bankruptcy Judge's summary, at pp. 11–14 of his memorandum opinion, of the evidence that led to his conclusion that WEA, acting through its agents, knew sufficient facts to put it on notice to make an inquiry which would, in turn, have revealed the Bankrupt's insolvency as early as August 1, 1972. The Court concurs in the Bankruptcy Judge's reliance on General Electric Credit Corp. v. Davis, 224 F.2d 322 (4th Cir. 1955), in reaching that conclusion, as that was a case bearing a significant factual similarity to the instant case.

On the other hand, the Court is not persuaded by WEA's argument concerning Mr. Alsheimer's use of the phrase "at that moment" in characterizing the information held by Mr. Slaveter, an agent of WEA, at the time the two were discussing the Bankrupt's financial condition, on July 7 or 8, 1972. It is WEA's contention that this phraseology limits the evidentiary value of Mr. Alsheimer's testimony, relative to WEA's alleged notice of the Bankrupt's insolvency, to the date on which the conversation took place. This would have been after the alleged preferential transfer of August 1, 1972.

The Court is likewise unpersuaded by the argument that Mr. Alsheimer's use of the phrase "to our knowledge" also limits the value of the testimony to the same date. It is WEA's contention that this phraseology indicates that the critical information was the result of pooled data which had been held separately by the two parties prior to the date of their conversation. The argument proceeds that the lesser information held by WEA, prior to the date of the conversation in question, would have been less meaningful.

The Court would point out that the over-all tenor of Mr. Alsheimer's testimony does not suggest that it was necessarily intended to be so limited. Hr. Tr., at 20–22. Moreover, the Bankruptcy Judge's summary of the relevant evidence references a great deal of other information suggesting the Bankrupt's insolvency, which had come to WEA prior to August 1, 1972. It was therefore open to the Bankruptcy Judge to infer that the information discussed by Mr. Alsheimer and Mr. Slaveter on August 7th or 8th had actually been assimilated by WEA prior to August 1, 1972.

Finally, the Court is unable to perceive, in the remainder of the record, any conflicting evidence so strong as to rebut the conclusion reached by the Bankruptcy Judge regarding WEA's notice of the Bankrupt's insolvency. Accordingly, it must be held that said conclusion is supported by the record, and is not clearly erroneous.

### III.

The third issue raised is whether the Bankruptcy Judge committed prejudicial error by excluding as hearsay certain testimony relevant to the issue of WEA's notice of the Bankrupt's insolvency.

The evidence in question was proffered testimony by Fred Altimore, an agent of WEA, about information that had been given to him by an officer of the First and Merchants National Bank, in reference to a bank account which Mr. Altimore had thought belonged to the Bankrupt. The conversation took place some time in July, 1972.

■ It is basic that the testimony in question would have been properly excluded as hearsay if offered solely to prove the truth or falsity of the facts stated by the bank officer relative to the Bankrupt's actual financial condition at the time the statement was made. McCormick on Evidence, (1972) §§ 246, 249; V. Wigmore on Evidence (3d Ed. 1940). See also, Rule 801(c), Proposed Federal Rules of Evidence (R.D.1971). However, such testimony would also have been relevant to the issue of whether WEA had notice, as required under § 60(b) of the Bankruptcy Act, 11 U.S.C. § 96(b), of the Bankrupt's insolvency at the time the alleged preferences were made to it. Indeed, WEA alleges that the testimony, if received into evidence, "would have shown that . . [WEA] *believed* that the Bankrupt had an *incredibly large* amount of money in its checking account." Brief of Appellant, at p. 9. (Emphasis added). For such limited purpose, the testimony was within an exception to the hearsay rule, and should therefore have been admitted into evidence. McCormick on Evidence (1972), § 249, at p. 591.

■ The Court concludes further that the exclusion of this testimony was prejudicial to the petitioner, WEA. Other testimony actually received into evidence shows that WEA did make some inquiry as to the Bankrupt's financial condition. Hr. Tr. at 49–53. Assuming that the testimony excluded would, as alleged, have shown that WEA's inquiries led to a reasonable belief that the bankrupt had "an incredibly large amount of money in its checking account," it would have *tended* to rebut the other evidence concerning WEA's constructive notice of the Bankrupt's insolvency. The case is close enough that the testimony in question, if it is all it is alleged to be, *might* have caused the Bankruptcy Judge to reach an opposite conclusion in this regard. *Cf*. Seligson v. Roth, 402 F.2d 883, 887 (9th Cir. 1968).

Accordingly, the case will be remanded to the Bankruptcy Judge in order that the testimony in question may be admitted into evidence, and given appropriate consideration as to the notice issue.

The Court does not suggest, however, that such testimony, even assuming the full effect claimed by WEA, would be necessarily controlling. See General Electric Credit Corp. v. Davis, 224 F.2d 322, 323–324 (4th Cir. 1955). *Cf*. Seligson v. Roth, *supra*, 402 F.2d at 887, with Employers Mutual Casualty Co. v. Hinshaw, 309 F.2d 806, 808–809 (8th Cir. 1962). It may be that the Bankruptcy Judge will be unpersuaded that a reasonably prudent person would have ended the inquiry with the knowledge claimed, particularly in view of the other evidence in the record as to WEA's additional knowledge concerning the Bankrupt's low inventory levels and large liabilities. Indeed, it may be that what WEA contends to be the amount of money which it thought the Bankrupt held in its checking account would, nonetheless, have been insufficient, combined with WEA's estimate of the Bankrupt's other assets, to cover the liabilities of which WEA knew the Bankrupt had. It is what WEA knew, or should have known, concerning the *relationship between assets and liabilities* that is ultimately in question; not what WEA knew, or should have known, about one item or the other. However, the ultimate issue will depend, to some extent, on the weight to be given the testimony of different witnesses, and the inferences to be drawn therefrom. Accordingly, it is a question to be determined, in the first instance, by the Bankruptcy Judge, as trier of fact, after the previously excluded testimony has actually been admitted into evidence. Only then should the matter be given further consideration by this Court to determine whether the Bankruptcy Judge's ultimate finding is clearly erroneous. What the respondent fails to note in its brief is that this, indeed, was the procedural posture of the case in General Electric Credit Corp. v. Davis, *supra*, 224 F.2d 322.

Moreover, it may be that the testimony in question will not prove to be all that it is purported to be. It may be, as the respondent's brief points out, that the bank account in question was not actually one belonging to the Bankrupt, and that WEA's belief that it was, however honestly held, was not reasonably based.

Finally, the Court would note that, on remand, the trustee should be given the opportunity to offer new evidence in rebuttal to the testimony which had previously been erroneously excluded.

### IV.

The final issue presented is whether the record is deficient in failing to establish that the $12,108.39 in cash payments and returned goods, which the Bankruptcy Judge found to have constituted preferences, had the effect of enabling WEA "to obtain a greater percentage of [its] debt than some other creditor of the same class." Cf. § 60(a) of the Bankruptcy Act, 11 U.S.C. § 96(a).

WEA's contention, in this regard, raises the possibility that the Bankrupt had paid off an equal percentage of its debts to all other creditors during the crucial time period. Assuming the bankrupt had done so, all of the creditors would now stand on an equal footing with regard to the pro-rata distribution of remaining assets in bankruptcy. WEA further argues that the burden was on the trustee to establish that this was not, in fact, the case and that the trustee has failed to carry that burden.

 The Court agrees with the petitioner, WEA, that the burden was on the trustee to establish this element. Barry v. Crancer, 192 F.2d 939 (8th Cir. 1952). See also, Varnell v. Good-Wynn Electrical Supply Co., 312 F.Supp. 66, 70 (N.D.Ga.1969). Indeed, the burden is on the trustee to establish each and every element of a voidable preference under § 60(a)(1) of the Bankruptcy Act. Moran Bros., Inc. v. Yinger, 323 F.2d 699 (10th Cir. 1963). Of course, where the issue is not controverted, the trus-

tee's allegations in his pleadings may be sufficient to establish a particular element, as well pleaded facts are deemed admitted, unless denied. Rule 8(e), F. R.Civ.P. Cf. In Matter of Newman Co., 193 F.Supp. 554 (N.D.Ohio 1961).

 In this case, however, the petitioner, WEA, in paragraph 5 of its answer to the trustee's counterclaim, denied generally the preferential effect of the payments in question. It was therefore incumbent on the trustee to prove, by the preponderance of evidence, that said element was present. Barry v. Crancer, 192 F.2d 939 (8th Cir. 1952). Cf. Moran Bros., Inc. v. Yinger, 323 F. 2d 699 (10th Cir. 1963).

Upon careful examination of the record, the Court is unable to discern any evidence tending to establish that payments, proportional to those here in question, were not also made to all of the Bankrupt's other creditors during the crucial time period.

Contrary to the respondent's contention, the decision in Palmer Clay Prods. Co. v. Brown, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936), is not controlling of the issue presently before the Court. In Palmer there was no apparent contention that all other creditors might also have received proportional payments during the crucial time period. The issue in *Palmer* was simply whether the alleged preferential effect of a transfer should be determined by reference to a hypothetical distribution of assets that would have been possible at the time of the questioned transfer, or by reference to the actual distribution in bankruptcy. 297 U.S. 228–229, 56 S.Ct. 450. The Court in *Palmer* decided in favor of the latter. In this case, there was no evidence that the preferential effect would, in fact, have been felt under either theory.

Jentzer v. Viscose Co., 13 F.Supp. 540 (S.D.N.Y.), aff'd, 82 F.2d 236 (2d Cir. 1936), is similarly distinguishable as having involved a different factual issue. Indeed, the district court there specifically limited its holding to situations

where "proportionate payments . . . [have not been made] to all other creditors of the same class." 13 F.Supp. at ·544. Presumably, no question had been raised in *Jentzer* as to whether such payments (to other creditors) might, in fact, have been made.

Accordingly, the $12,108.39 judgment for the trustee on its counterclaim must be reversed, and judgment entered for the petitioner, WEA, in this regard.

The Court would point out, however, that the decision in this regard has no effect on the finding that WEA's security interests in the Bankrupt's property were also voidable preferences. First, the preferential effect of those transfers does not appear to have been placed in controversy, as WEA made no denial of the trustee's allegations in that regard. Second, those transfers, by hypothesis, would have a preferential effect. Assuming the security interests would be upheld, WEA would thereby be able to achieve full recovery of its claims. The remaining creditors, on the other hand, would be able to recover only a pro-rata portion of their claims out of the remaining assets.

An order consistent herewith will enter.